[Nos. 37896-1-I; 38012-5-I. Division One. April 13, 1998.]

THE OVERLAKE FUND, ET AL., *Appellants*, v. THE
SHORELINES HEARINGS BOARD, ET AL., *Respondents*.

THE CITY OF BELLEVUE, *Appellant*, v. GEOFFREY J.
BIDWELL, ET AL., *Respondents*.

---

[2]We also note that the father does not appeal the joint decision-making provisions of the plan.

748

BECKER, J., dissents by separate opinion.

*Ann M. Holmes* and *Ramona L. Monroe* of *Stoel Rives Boley Jones & Grey*; and *Richard L. Andrews, City Attorney*, and *Lori M. Riordan* and *Patrice C. Cole, Deputies*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Jean M. Wilkinson, Assistant*, for respondent Shorelines Hearings Board.

*Jeffrey J. King* of *Townsend, Townsend & Crew*; and *Toby Thaler*, for respondent Bidwell.

AGID, J. — These are difficult times for property owners, community groups and municipalities, the triumvirate involved in every major land use issue. The manner in which one uses—or does not use—land is debated endlessly and has become a volatile emotional issue for all concerned. Peace may not be at hand, but the courts and the agencies charged with applying land use and environmental regulations have a responsibility to be evenhanded and balance the many competing concerns.

After five years and seven redesigns, the City of Bellevue (Bellevue) issued a conditional use permit, a shoreline height variance and a substantial development permit to the Overlake Fund to construct a hotel on the shore of Lake Washington. Bellevue imposed numerous conditions on the permits to protect the surrounding environment and comply with zoning, building, traffic and fire safety requirements. No one appealed the conditional use permit. Geoffrey Bidwell appealed the shoreline permits to the Shorelines Hearings Board (Board). After a hearing, the Board affirmed the height variance. It also "affirmed" the substantial development permit, but only after imposing additional conditions which prohibited Overlake from using any of the wetland on the site for any purpose. Overlake and Bellevue appealed the substantial development permit decision to the superior court which affirmed the Board. Bellevue and Overlake appealed to this court. We conclude that the administrative board unnecessarily thwarted Bellevue's careful, balanced permitting decisions by considering issues not before it and failing to recognize the importance of balancing competing interests. The Board ignored or did not inquire into the reasons for the municipal balancing act, considered only one of the many

competing values that contributed to Bellevue's decision and substituted its judgment on the reasonableness of the use for that of local decision-makers. We hold that the decision of the Board redesigning the Overlake hotel project was arbitrary and capricious and not supported by substantial evidence. We therefore reverse and remand to reinstate the original permits issued by Bellevue. This will restore the balance Bellevue sought to achieve.[1]

## FACTS

After years of negotiation and attempts to find an economically-viable plan that satisfied its myriad planning and environmental concerns, Bellevue issued a substantial development permit and shoreline variance to Overlake on October 21, 1993. As finally approved, the permits allowed Overlake to construct a 7-story, 238 room hotel with parking for 346 vehicles on a 6.9 acre parcel of land located between downtown Bellevue and the Lake Washington shoreline. The Department of Ecology (DOE) approved the permit and variance subject to certain conditions on November 29, 1993. As outlined above, these appeals followed.

Overlake has owned the property on which the hotel is to be built since 1980. It has been zoned for urban uses, Office and Limited Business, since 1981. Of the 6.99 acre site, 0.8 acre is dry land. The remaining 6.19 acres are wetland. The proposed construction would use 1.62 acres of the site and impact between .73 and 1 acre, or 13 percent of the site's total wetland. If no further design review changes are authorized, the project will have some impact on .82 acre of the 6.19 acres of wetland, but 5.73 acres will remain untouched. The proposal was conditioned on the developer's implementing a number of wetland mitigation

---

[1]Geoffrey Bidwell's motion to strike portions of Overlake's reply brief was passed to hearing on the merits. The reply brief is 23 pages long and includes a 171-page appendix. The record is voluminous. The materials in the appendix are in the record, and locating them in one place makes it easier for the court to find them. We therefore deny the motion to strike.

measures. The Corps of Engineers,[2] the Department of Ecology and Bellevue have all issued permits and approved the project. It has gone through the process of developing an environmental impact statement and seven redesigns over five years. The original proposal would have covered 1.5 acres of wetland. That has been reduced to a little over half of the originally-proposed wetland coverage. Even though the Corps approved filling an acre of the property, Bellevue insisted on redesigns that put the structure as far upland as possible on the dry portion of the property and located the wetland development on pilings to minimize any impact on the wetland below.

The property is bisected by Sturtevant Creek which flows from the north through the wetland and connects to Mercer Slough and Lake Washington. The Board found that although road and building development had acted over time to isolate the wetland adjacent to the project from the larger Mercer Slough wetland, it remains a functioning part of the Mercer Slough system as a whole and is not an isolated wetland.[3] The substantial development permit approved by Bellevue allowed the hotel to cover 52,274 square feet of the site, including 35,624 square feet on pilings over the wetland. The Board observed that, as approved, the hotel would cover all of the dry land on the site, except for the street setbacks required by Bellevue, and .82 acre of the wetland. It also found that, although there had been agricultural activities in portions of the wetland system, the site is in an essentially natural state. The Board concluded that the proposed development would intrude into and damage the wetland and that the proposed mitigation plan failed to adequately mitigate the impact of the hotel on it. The Board approved a height variance of 92.27

---

[2]The Corps permit authorized Overlake to fill up to one acre of the site.

[3]The Board's finding was based on a wetland delineation conducted in October 1990 by environmental consultants Shapiro & Associates who determined that the site included approximately .8 acre of dry land and that the remainder of the site was wetland. We note that the proposal vested upon application on June 24, 1987. The Sensitive Area Overlay District and its wetland classifications therefore do not actually apply to the project.

feet because Bidwell failed to meet his burden of proof on that issue, but modified the substantial development permit to prohibit any use of the wetland on the site. It also imposed, sua sponte, view, public access and lighting conditions on the project.[4]

## DISCUSSION
### Standard of Review

All development on the shorelines of this state undertaken after June 1, 1971, must conform to the Shoreline Management Act of 1971 (SMA), RCW 90.58. *Buechel v. Department of Ecology*, 125 Wn.2d 196, 203, 884 P.2d 910 (1994). The Shorelines Hearings Board reviews the issuance of a shoreline development permit de novo. *Buechel*, 125 Wn.2d at 202. Appellate review is of the Board's decision, not that of either the local government or the superior court, and is based on the record before the Board. *Buechel*, 125 Wn.2d at 202.[5] Courts review the Board's decision to determine whether it is supported by substantial evidence

---

[4]The specific conditions imposed by the Board were as follows:

a) No portion of the hotel, parking structure, or any other building on the site may extend into the wetland . . . Because the dry land on the site is less than the footprint of the proposed structures, the footprint of the structures shall be reduced, in a configuration which avoids intrusion into the wetland; and

b) The developer may create a balcony, promenade, deck or similar appurtenance to the hotel extending out over the wetland by up to a total of 5,000 square feet, provided: that any such structure is readily available to the public at all reasonable daylight hours . . . ; and

c) Neither the hotel, the parking structure, any other structure, nor the viewing structure described above may be supported by any pier, piling, or other foundation element in the wetland, and the edge of the wetland may not be excavated or otherwise altered; and

d) All exterior lighting on the wetland sides of the structures shall be aimed toward the structures or otherwise away from the wetland, so as to minimize the effects of artificial lights on wildlife in the wetland; and

e) Because these conditions will reduce the impacts of the project on the wetland, the wetland mitigation plan elements involving any work more than two hundred yards from the structures are eliminated. Those elements of the mitigation within two hundred yards remain as approved by the City.

[5]After the Supreme Court's decision in *Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 932 P.2d 158 (1997), there is some question

in light of the entire record, or is arbitrary and capricious.[6] RCW 34.05.570(3); *Heinmiller v. Department of Health*, 127 Wn.2d 595, 607, 903 P.2d 433, 909 P.2d 1294 (1995), *cert. denied*, 516 U.S. 1006, 116 S. Ct. 2526, 135 L. Ed. 2d 1051 (1996); *Buechel*, 125 Wn.2d at 202. " 'Substantial evidence is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises".' " *Heinmiller*, 127 Wn.2d at 607 (quoting *Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994)). A decision is arbitrary and capricious if it is " 'willful and unreasoning action in disregard of [the] facts and circumstances.' " *Buechel*, 125 Wn.2d at 202 (quoting *Skagit County v. Department of Ecology*, 93 Wn.2d 742, 749, 613 P.2d 115 (1980)). Where there is room for two opinions, an action is not arbitrary and capricious so long as it is undertaken honestly and upon due consideration, even if the reviewing court disagrees with it. *Buechel*, 125 Wn.2d at 202.

Legal determinations of administrative agencies are reviewed under an error of law standard which permits a reviewing court to substitute its interpretation of the law for that of the agency. *Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991). While we give substantial weight to agencies' interpretations of the law within their areas of expertise, we need not do so when

about which decision we in fact review. The majority there reviewed the superior court's decision directly, even though the superior court was acting in an appellate capacity reviewing a legal conclusion of the Pollution Control Hearings Board (PCHB). 131 Wn.2d at 349-50, 352, 365. The concurrence/dissent pointed out that the question whether the PCHB had erred was "the only question which is properly before us procedurally" and went on to analyze that issue. 131 Wn.2d at 365. The majority did not respond. Under these circumstances, we cannot conclude that the majority intended to overrule settled law directing us to review the administrative decision, not that of the superior court. *In re Electric Lightwave, Inc.*, 123 Wn.2d 530, 541, 869 P.2d 1045 (1994) (Court of Appeals does not rely on cases that fail to specifically raise or decide an issue).

[6]We have revised our opinion [*Overlake Fund v. Shorelines Hearings Board*, Nos. 37896-1-I; 38012-5-I (Wash. Ct. App. Jan. 12, 1998)] to remove references to the clearly erroneous standard in light of counsel's contention on a motion for reconsideration that we should have applied the substantial evidence standard. We note, however, that the result is the same because we had already examined the Board's findings under the substantial evidence standard. We further note that neither counsel cited the case they now rely on in their original briefs and relied instead on *Buechel*, 125 Wn.2d 196, a case that incorporates the clearly erroneous standard.

they are applying the law of another jurisdiction. *Id*. at 728.

## The Board's Findings

■ The Board made several dispositive findings which Overlake and Bellevue contend are not supported by substantial evidence. The Board found that: (1) the wetland on the site is in an essentially natural state (finding XIII);[7] (2) its function and value is similar to that of the Mercer Slough (finding IV);[8] and (3) neither Overlake nor Bellevue designed the project to minimize intrusion into

---

[7]Finding XIII states:

Despite some history of agricultural activities in portions of the wetland system, the portion of the wetland on which the proposed hotel would sit is in an essentially natural state, and is a natural shoreline.

[8]Finding IV states:

The wetland on which the project sits is a roughly rectangular piece bounded by S.E. 6th, S.E. 8th, 112th S.E., and 114th S.E. It is bisected by Sturtevant Creek, which flows from the north, through the wetland, and connects to Mercer Slough and Lake Washington proper. The wetland is an upstream part of the Mercer Slough system, and partakes of many of the wetland values and functions performed by Mercer Slough as a whole. While road and building development has incrementally acted to isolate the project area wetland from the larger Mercer Slough wetland, it originally was and is now a part of that larger wetland, and it is not an isolated wetland.

A wetland delineation was conducted in October, 1990, by Shapiro and Associates, environmental consultants in Seattle, which determined the site to include approximately 0.8 acre of dry land, the balance being wetland.

Wetland functions performed by this smaller portion of the Mercer Slough wetland include flood storage, storm water filtration, and animal habitat, encompassing mammals, birds, reptiles and amphibians. By the evidence of dead animals found on adjacent streets, both beaver and muskrat are present, and blue herons nest in the portion of the Mercer Slough system immediately south of this wetland rectangle. Evidence of fish life in Sturtevant Creek exists, although its importance in that regard is not clear.

The Mercer Slough wetland system is a natural feature of the first importance. It has been the focus of a great deal of citizen activity and concern. As a result of citizen interest, the City of Bellevue designated a 320 acre area downstream from this project as a nature park, with funding coming from state and local government sources as well as directly from Bellevue citizens voting to tax themselves for property acquisition. The importance of Mercer Slough is increased by the destruction of the great majority of the wetlands bordering Lake Washington, both in Bellevue and on other shorelines of the Lake.

the wetland (finding XI).[9] They also challenge the Board's conclusion, based on those findings, that Overlake's mitigation plan failed to adequately mitigate the impact of the project on the wetland. *See Batchelder v. City of Seattle*, 77 Wn. App. 154, 158, 890 P.2d 25, *review denied*, 127 Wn.2d 1022 (1995) (there is "substantial" evidence to support an agency decision if it would convince an unprejudiced, thinking mind of the truth of the declared premise).[10]

 While there is evidence in the record to support some of the Board's findings,[11] it is insufficient to support the critical findings that led to the remedy the Board imposed. The Board heard evidence that the affected wetland is a "type-A" wetland and that Sturtevant Creek, which bisects the project site, is a "type-A riparian corridor."[12] It also heard evidence about the function and value of the wetland in the general area, as well as the impact of the proposed development on both the project area wetland and parts of the Mercer Slough, including testimony that the site is a very sensitive area that is part of the slough system generally, that the vegetation on the main wetland block area is similar to that of the Mercer Slough itself, and that there are various species of birds and mammals on site.

But the issue in this case is not simply whether the wet-

---

[9]Finding XI states:

> Despite the huge size of the proposed building in relation to the small amount of dry land available on the site, neither Overlake nor the City designed the project to minimize the intrusion into the wetland. Overlake's design has the hotel built around a central courtyard, thus using up precious dry land. Bellevue required setbacks from the street on two sides for aesthetic reasons, thus forcing the entire structure farther into the wetland.

[10]Overlake's argument incorrectly assumes that the Board is required to defer to a local government's decision to grant a substantial development permit "[a]bsent substantial evidence that [its] decision was inconsistent with the [SMA] or the [applicable] Master Program." While due deference is given the specialized knowledge and expertise of the Board, the Board is not required to give the local government's decision to grant the permit any particular deference. *Buechel*, 125 Wn.2d at 202-03.

[11]As the superior court observed below, the "record [is] there for [the appellate court] to paw through."

[12]*But see* footnote 3, above.

land adjacent to the project is part of the Mercer Slough or not. There was testimony on both sides of that issue. Besides the testimony the Board relied on, other witnesses testified that the Mercer Slough is approximately 1,000 feet from the project. Those witnesses established that the wetland adjacent to the project is significantly degraded by the proliferation of commercial development next to it and is not of the same quality as either Sturtevant Creek or the Mercer Slough. There was also testimony that the adjacent wetland has no trees or shrubs on it and is covered with reed canary grass, an invasive nonnative species that moved in after the earlier agricultural uses were abandoned and which is of little value to the native wetland species except for flood storage and biofiltration. The flood control and drainage capabilities of the area will be affected very little because the portion of the building and garage which are over the wetland will be built on pilings, rather than on the fill placed in the wetland which the Corps of Engineers had approved. Bellevue required the applicants to provide wetland enhancement for .64 acres on the property and 1 acre in Mercer Slough Nature Park to compensate for putting pilings in .82 acres of its site. The applicant must place native trees, shrubs and other plantings in these areas to improve the wildlife habitat and water quality function of the wetland. Thus, even if the adjacent wetland is part of the Mercer Slough system, substantial evidence does not establish that the project will degrade that system as a whole.

The Board also concluded that neither Overlake nor Bellevue designed the project to minimize intrusion into the wetland. It found that "Overlake's design has the hotel built around a central courtyard, thus using up precious dry land." Bellevue required setbacks from the street on two sides for what the Board characterized as "aesthetic" reasons, thus forcing the entire structure farther into the wetland. Finding XI. The Board further explained in finding VII:

Bellevue's land use code incorporates a wide range of values,

from environmental protection to protection from adverse effects of density, noise, and parking. One of the values it seeks to further is the aesthetic one of how a development looks and feels from the street. To this end the City requires set-backs from the street for new construction. The required setback for the Overlake project would by code have been 50 feet, unless a smaller setback were approved. The City did grant smaller setbacks. In order to reduce the intrusion of the hotel into the wetlands, City staff had recommended little or no setback from the street line on the S.E. 6th side. The City Council, apparently weighing street [a]esthetics more heavily, required a 20-foot setback from the street, at the cost of greater intrusion into the wetland.

■■ ■■ The Board correctly observed that the building is designed around a courtyard. The courtyard would take up 8,000-9,000 square feet of usable building area. However, this is a de minimus intrusion into the wetland. Even if it were eliminated, the portion of the project on pilings would still cover over 27,000 square feet of the wetland. The size and configuration of the auto court promotes access and traffic safety and reduces traffic on adjacent streets. The Board was also correct in observing that, by requiring 20-foot setbacks, Bellevue did not go as far as it theoretically could have to minimize intrusion onto the wetland. But this was an improper consideration and could not be used as a basis for revising the project.

The Board's finding that Bellevue required a 20-foot setback for "aesthetic reasons" is also simply wrong. There was no appeal of the Conditional Use Permit which was the only permit incorporating Bellevue's decision to grant 30-foot rather than 50-foot variances from the 50-foot setbacks required by the Land Use Code for the Office, Limited Business (OLB) zone in which the project is located. Because the Conditional Use Permit was not appealed, the issue was not before the Board and no party developed a record on the basis for Bellevue's decision to require a 20-foot

setback.[13] Yet it was Bellevue's decision to require that setback which prompted the Board to find that Bellevue had given insufficient consideration to the shoreline issues and focused instead on streetside "aesthetic" considerations when it approved the project.

In fact, the reasons for the 20-foot setback requirement, as reflected in the hearing examiner's findings, were completely unrelated to "aesthetics." Rather, they stemmed from the problems the applicant and Bellevue had in vacating a right-of-way adjacent to the property because yet another agency, the State Department of Transportation, was considering using that right-of-way to install a light rail system. Because the right-of-way was not available, the 20-foot setback was necessary to provide fire lanes and sight distances for traffic safety purposes. Bellevue specifically recognized the relationship between the setback and the wetland impact in its Conditional Use Permit and granted the 30-foot variance in order to reduce that impact to the maximum degree possible without ignoring legitimate fire and traffic safety concerns. Far from being an "aesthetic" decision, this was one of many ways in which Bellevue balanced competing important safety and environmental concerns.

This factual error was compounded by the Board's legal conclusion that Bellevue's failure to grant a variance to permit a zero lot line (i.e., no setback at all) was in conflict with the Bellevue Shoreline Master Program (BSMP). But it was unable to cite any provision of the BSMP which requires, prohibits or even relates to setbacks or variances from them. Rather, the Board assumed that Bellevue required a 20-foot setback for aesthetic reasons, thereby giving insufficient weight to shoreline concerns. Based on its assumption, it then concluded that Bellevue's action

---

[13]Bidwell contends on reconsideration that the validity of the Conditional Use Permit (CUP) was at issue before the Board. However, it was not appealed. Shorelines Hearings Board Prehearing Order (listing issues). A CUP is a Process I permit. Bellevue Land Use Code (BLUC) 20.35.015(B)(1). Appeals of final decisions on CUPs is to the superior court under RCW 36.70C, not the Shorelines Hearings Board. BLUC 20.35.070(A).

was in conflict with the BSMP. The Board then cited the provision of the BSMP which requires Bellevue to give effect to the BSMP where there is a conflict between the land use and shoreline regulations. Bellevue City Code (BCC) 20.25E.030. But because there is no BSMP setback regulation that conflicts with the 50-foot setback requirement in the OLB land use zone, that provision simply does not apply here. Nor is there any provision in the BSMP which provides that Bellevue must grant setback variances to minimize the impact on wetland or the shoreline. The combination of this legal error and the factual errors on which it is premised undercuts much of the rationale for the Board's decision. It was this fundamental error, together with the Board's admittedly sua sponte determination discussed below that a hotel, a use permitted outright by the zoning, was not a reasonable use of the property, that produced its decision to "redesign" the building to do what Bellevue had not done—remove *all* potential for *any* impact on the adjacent wetland.

After reviewing the record, we are convinced that the real reason for the Board's decision was that it believed the proposed use was not reasonable.[14] The Board acknowledged that the reasonableness of the use of this property was not before it. Yet it went out of its way to announce that it "questioned" the reasonableness of the use and would have so opined had it been asked. The Board had no basis on which to consider whether the Bellevue City Council had

---

[14]Or, in the Board's words:

> The question of whether the proposed project constitutes a reasonable use was not brought before the Board by either party directly. However, a proposal which would put such a massive structure on, and overlapping beyond, such a tiny sliver of dry land, inclines the Board, *sua sponte*, to wonder whether such a use is reasonable for this site.

Finding V. And:

> We find that while the height variance for the project could sensibly be questioned on a number of [criteria], including the reasonableness of the proposed use, appellant has failed to carry his burden of proof .... Absent such proof by appellant, the Board cannot overturn the height variance.

Finding XVII.

adopted a reasonable use for the property. No one questioned that legislative decision, and no change of use or zoning was required to build this project. The Board's sua sponte consideration of this issue reveals its true attitude toward the proposed project, an attitude which affected its ability to look objectively at the evidence and balance the competing values that were properly before it.

Most of the problems with the sufficiency of the record and the Board's findings arose from the real nature of the appeal. Bidwell's primary objection to the project was not wetland impact but the potential impact the height of the building could have on the blue heron rookery 900 feet from the project. He had "no problem" with the building being on pilings in the wetland and would have traded greater wetland coverage for reduced height. While he did present testimony about the nature of the wetland, and particularly the Mercer Slough, his emphasis was on the height of the building. He thus provided little basis for the Board to conclude that the impacts of the proposal on the adjacent wetland, as opposed to the height of the building, would have any impact on the slough and its wetland park 1,000+ feet away. Because his appeal focused on height impacts, and the Board rejected that argument for lack of evidence, he did not develop a record sufficient to support the Board's findings on wetland impact or its remedy.

The point is that, even if the adjacent wetland is part of the system in which the Mercer Slough Nature Park is located, that does not answer the questions presented to the Board by Bidwell's appeal. The SMA does not prohibit all development in the shoreline. Rather, its purpose is to allow careful development of shorelines by balancing public access, preservation of shoreline habitat and private property rights through coordinated planning, *i.e.*, shoreline master plans which must be approved by DOE. RCW 90.58.020. In this case, the Board ignored the other components of the SMA's purpose in order to prohibit any development at all in the wetland. The Board's findings and conclusions establish that it did not think the proposal

was a reasonable use of the land and that it believed Bellevue had ignored the mandate of the SMA by sacrificing some wetland protection to its selfish "aesthetic" concerns. It therefore redesigned the project in a manner that makes it completely infeasible to build.

The SMA is a very significant piece of legislation with an extremely laudable purpose. But it is not the only statute or ordinance that decision-makers must consider in achieving the balance mandated by the SMA. Because the Board arbitrarily chose not to learn about or to ignore the other significant considerations that went into the decisions of the Corps of Engineers, the Department of Ecology and Bellevue to permit this project, its decision cannot stand.

██ ██ The dissent is premised on the same fatal flaw.

> The majority allows there was substantial evidence to support the Board's finding that the wetland on the site is in a natural state, with function and value similar to Mercer Slough. This was all that was necessary to show that the project, which degrades close to an acre of the wetland, was at odds with the policies calling for conservation of existing natural resources.

Dissent at 769 (footnote omitted). But the mere fact that a wetland is in a "natural" state does not require that it remain that way or dictate the result of the permitting process. Both the SMA and the Bellevue Shoreline Master Program contemplate and permit the full range of land uses even within the shoreline district. Different zoning classifications and shoreline designations are designed to provide different levels of protection for shorelines. While Bellevue has not expressly adopted these designations, they establish the range of uses permitted and expected in the shoreline. The most restrictive designation is "Natural." WAC 173-16-040(4)(b)(i). The natural environment "is intended to preserve and restore those natural resource systems existing relatively free of human influence" and therefore permits little or no development. *Id.* By contrast, the "Urban" environment is the least restrictive designa-

tion, recognizing that commercial, residential and industrial uses will be located in those portions of the shoreline area. WAC 173-16-040(4)(b)(iv). "[H]igh-intensity land-use" is expected in the urban environment which "is particularly suitable to those areas presently subjected to extremely intensive use pressure, as well as areas planned to accommodate urban expansion." *Id.* In other words, this is an environment that would be characterized as "urban" under the classifications recommended in the SMA. The State shoreline regulations also recognize that, within the limited urban shoreline area, "emphasis should be given to development within already developed areas." *Id.*

As noted above, Bellevue designated the Overlake property OLB, Office and Limited Business, in which hotels are a use permitted outright. The adjoining parcels are already developed with office or industrial uses. This is an urban shoreline environment. When it approved the Bellevue Shoreline Master Program,[15] DOE approved Bellevue's decision to permit the high-intensity commercial uses contemplated by the regulations governing the urban Shoreline environment along this portion of Lake Washington. In so doing, both the City and DOE recognized that the area in which this proposal is located is an already-developed area within a city which is suitable for commercial development. In an ideal world, we might well choose to preserve all shorelines in a natural, undisturbed state. But the Shoreline Management Act, DOE and the City understand that, in a practical world, urban pressures exist and permitting a range of uses is necessary to accommodate those pressures. On the sliding scale of values contemplated by the Act and regulations, the natural condition of the wetland portion of the site simply does not justify effectively denying a permit for an urban use in an urban area of the shoreline.

In short, we conclude that the Board's decision to limit building to the dry land area on the site was not supported

---

[15]In the Bellevue Land Use Code, it is called the Shoreline Overlay District. BCC 20.25E.

by evidence that is substantial in light of the whole record before the court. *Heinmiller,* 127 Wn.2d at 607. In addition, in deciding whether Bidwell had met his burden of proof on appeal of the substantial development permit, the Board relied on the setbacks approved in the conditional use permit and the reasonableness of the use, neither of which was before it and neither of which it could consider. Its decision was therefore "in disregard of [the] facts" and arbitrary and capricious. *Buechel,* 125 Wn.2d at 202.

Because we decide that the Board's decision must be reversed for these reasons, we need not decide the other issues Bellevue and Overlake raise. Bidwell's motion to strike portions of Overlake's reply brief is denied.

Reversed and remanded to reinstate the substantial development permit as issued by the City of Bellevue.

KENNEDY, C.J., concurs.

BECKER, J. (dissenting) — The Shorelines Hearings Board's findings, in my view, accurately summarize the testimony and other evidence presented in three days of hearings on Overlake's hotel proposal. The Board's imposition of a condition that the hotel not intrude into the wetland was a reasonable exercise of the Board's authority, supported by the evidence and the policies of the Shoreline Management Act.[16] Because I believe the majority has improperly substituted its judgment for the Board's, I respectfully dissent.

The Shoreline Management Act is to be liberally construed "to give full effect to the objectives and purposes for which it was enacted."[17] The essential purpose of the Act is to protect shorelines. Shorelines are not, as the majority suggests, simply one among many competing concerns that local governments have to balance; if that were so, there would have been no reason to pass the Act. Shorelines of

[16]RCW 90.58.

[17]RCW 90.58.900.

the state, because they are "among the most valuable and fragile of its natural resources,"[18] have priority. When the people of the state approved the Shoreline Management Act in 1971, they directed that "the interest of all the people shall be paramount in the management of shorelines of state-wide significance."[19] And they approved the creation of the Shorelines Hearings Board to ensure the enforcement of that paramount interest.

In reviewing Bellevue's substantial development permit allowing Overlake to build part of its hotel on pilings in the wetland, the Board could not allow the development to proceed unless the Board found it to be "consistent with the policy of [the Shoreline Management Act of 1971] and . . . the applicable guidelines, rules, or master program."[20]

The Board hears a petition for review concerning a substantial development permit de novo. This means the Board is not required to accord any particular deference to the decision of the local government.[21] The Board is recognized as having "specialized skills in hearing shoreline cases,"[22] and this court is obligated to give due deference to

---

[18]RCW 90.58.020.

[19]*Id.*

[20]RCW 90.58.140.

[21]*Buechel v. Department of Ecology*, 125 Wn.2d 196, 202-03, 884 P.2d 910 (1994). During his opening remarks, the presiding member of the Shorelines Hearings Board emphasized this point:

I want to remind everyone that this is not an appeal on the question of whether the city made a mistake. This is a de novo determination of whether this permit and this variance meet requirements of the law on the issues specified in the prehearing order, and so testimony as to the diligence with which the city pursued its decision is not relevant; I don't want to hear it.

Testimony with regard to whether particular individuals in city government or Department of Ecology felt the project met particular criteria in the law is not relevant and calls for legal conclusions that are exactly the [province] of this board's decision.

Transcript of Proceedings, at 40, Day One.

[22]*Buechel*, 125 Wn.2d at 204 (footnote omitted).

the Board's "specialized knowledge and expertise."[23]

This court reviews the present order of the Shorelines Hearings Board against a number of challenges. Primarily the appellants contend the Board's order is arbitrary and capricious; not supported by evidence that is substantial when viewed in light of the whole record; and that the Board has erroneously interpreted or applied the law.[24] With respect to the first two grounds for challenge, a court may not substitute its judgment for that of the Board; it may reverse only if the Board's order is a willful, unreasoning action, in disregard of facts and circumstances, or if firmly convinced that a mistake has been committed in light of the policy of the Act.[25] With respect to interpretation of the law, a reviewing court may substitute its judgment for the Board's when "necessary to ensure that a proposed project complies with the SMA,"[26] but should ordinarily give substantial weight to the Board's interpretation of the law within its area of expertise.[27]

The majority suggests that a court need not give substantial weight to the Board's interpretation of law when the Board is applying "the law of another jurisdiction."[28] To the extent the majority implies that the Board was not acting within its expertise in applying Bellevue's Master Shoreline Program, I disagree. Shoreline master programs, though initially developed by local governments, are adopted as state regulations only after the State has approved them as consistent with the Shoreline Management

---

[23]*Buechel*, 125 Wn.2d at 203.

[24]*See* RCW 90.58.180(3) (incorporating review standards of Administrative Procedure Act, RCW 34.05.570, for appeals from decisions of the Shorelines Hearings Board).

[25]*See Hayes v. Yount*, 87 Wn.2d 280, 286, 552 P.2d 1038 (1976).

[26]*Jefferson County v. Seattle Yacht Club*, 73 Wn. App. 576, 588, 870 P.2d 987 (1994). *See also Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975).

[27]*Jefferson County*, 73 Wn. App. at 588.

[28]Majority, at 754-55.

Act.[29] The Board regularly applies and interprets them as state regulations when deciding whether or not to approve a substantial development permit. The Board's interpretation of Bellevue's Shoreline Master Program, not Bellevue's, is the interpretation to which due weight should be given by this court.

The majority erroneously declares the shoreline in question to be "urban."[30] The Bellevue Shoreline Master Program does not use the classifications of natural, conservancy, rural and urban, a system of classification that is recommended by the Department of Ecology but not required.[31] Instead, Bellevue specifies the shorelines to which each of its policies applies. The Majority concedes that Bellevue has not adopted Ecology's suggested classifications, yet concludes that if Bellevue had done so, it would have classified the project's environment as "urban."[32] This court cannot, by fiat, classify the project acreage as urban and therefore suitable for high-intensity land use when Bellevue's own shoreline plan designates Lake Washington wetlands within the city as subject to the highest degree of conservation. The land use designation of the property for office and limited business use is irrelevant because the regulations of the Shoreline Overlay District prevail over any conflicting land use district regulation.[33] The Bellevue City Council Ordinance approving the substantial development permit identified the following policies of Bellevue's Shoreline Master Program as relevant to the project in question:

> Uses and activities in unique or fragile areas should be

---

[29]RCW 90.58.090(3), (4); *Buechel*, 125 Wn.2d at 203-04.

[30]Majority, at 763.

[31]See WAC 173-16-040.

[32]Majority, at 763.

[33]Bellevue City Code 20.25E.030.

discouraged unless measures can be satisfactorily undertaken to mitigate all related adverse impacts.[34]

Existing natural resources should be conserved.

. . .

b. Wildlife habitat should be protected, improved and, if feasible, increased.

c. Unique and fragile areas should be so designated and maintained. Access and use should be restricted if necessary for the conservation of these areas.[35]

Wetlands

. . .

a. Economic uses and activities should minimize and cluster that water-dependent portion of their development along the wetland shoreline and place inland all facilities which do not require a water's edge location.

. . .

e. Economic development should be designed to preserve the aesthetics and natural amenities of the wetland area and to be compatible with appropriate existing developments in the same vicinity.[36]

All of the above policies are specifically applied to wetlands by the Bellevue Shoreline Master Program Policy Element.[37] In addition to the Master Program policies, the Act itself provides that local governments, in their planning for such shorelines, are to give preference to uses which "[p]reserve the natural character of the shoreline" and "[p]rotect the resources and ecology of the shoreline."[38]

The proposed hotel and parking structure is not a facility

---

[34]Bellevue Shoreline Master Program (BSMP) Policy 21.U.056.

[35]BSMP Policy 21.U.102.

[36]BSMP Policy 21.U.308.

[37]BSMP Policies 21.U.056, .102, .308; Ex. A-30.

[38]RCW 90.58.020. *See also* Conclusion of Law VI (citing RCW 90.58.020).

that requires a water's edge location.[39] The adjacent wetland, as an associated wetland of Lake Washington, is a shoreline of statewide significance.[40] And the adjacent wetland is functionally related to "a natural feature of the first importance,"[41] the Mercer Slough. Yet the City Council of Bellevue interpreted the pertinent policies as permitting the hotel to cover portions of the wetland. The Board, on the other hand, reasonably concluded that the proposed substantial development, to the extent it intruded into the wetland, was inconsistent with Bellevue's own shoreline policies, as well as the policy of the Act itself. The Board reached this conclusion after finding that the adverse impacts of the project on the wetland would not be mitigated by enhancement projects, uncertain of success, on wetlands some distance away.

## THE BOARD'S FINDINGS

Findings IV and XIII. The majority allows there was substantial evidence to support the Board's finding that the wetland on the site is in a natural state, with function and value similar to Mercer Slough.[42] This was all that was necessary to show that the project, which degrades close to an acre of the wetland, was at odds with the policies calling for conservation of existing natural resources. The majority then goes on to say, however, that the appellants did not introduce evidence that the project would degrade the Mercer Slough system as a whole.[43]

When a developer proposes to locate a substantial project on a particular stretch of shoreline, the Act does not require an opponent to prove the proposed development will degrade the larger system of which the particular shoreline

---

[39]Transcript of Proceedings, at 542, Day Three (project proponent concedes this point); see also Conclusion of Law IV (unchallenged).

[40]Conclusion of Law III (unchallenged).

[41]Finding of Fact IV.

[42]Majority, at 756.

[43]Majority, at 757.

is a part. Such a rule would render the Shoreline Act much less effective because often a single development will degrade an entire system either minimally or not at all. The Act as written contemplates restrictions that will forestall the continuing cumulative effects of development on shorelines.[44]

The material issue here was whether Overlake's proposal to cover a portion of a significant wetland was consistent with relevant shoreline policies. Consequently, the Board did not make, and did not need to make, a finding that the project would degrade the Mercer Slough system as a whole. The Board's decision cannot be reversed for a lack of substantial evidence to support a finding it did not make or need to make. Findings IV and XIII faithfully reflect testimony heard by the Board, and should be affirmed.

Finding XI. The Board found neither the City nor Overlake designed the project to minimize wetland intrusion. The Board specifically mentioned the dry land devoted to a central courtyard, and the City's required setbacks, which forced the structure further into the wetland "for aesthetic reasons." The majority dismisses the courtyard factor as de minimis because it involves only 9,000 square feet.[45] But the project as designed covers over 35,000 square feet of wetland. If one quarter of this amount can be spared, in my view the result is not de minimis, particularly when combined with the dry land lost to the setbacks.

As to the setbacks, the majority asserts they were necessary for safety concerns, not aesthetic reasons.[46] But the record reflects no reason other than street aesthetics for the 20-foot setback along S.E. 6th, the project's northern

---

[44]*See Hayes v. Yount*, 87 Wn.2d at 287-88. The Board heard testimony that Lake Washington has lost over 90 percent of its wetlands since the locks were built at the beginning of this century. Tr. of Proceedings, at 154, Day One.

[45]Majority, at 758.

[46]Majority, at 759.

boundary.[47] The only other concern I can locate in the hearing examiner's findings pertains to 114th Street S.E., the project's eastern boundary, where there was an identified potential future need for a rapid transit stop.[48] The Board's unchallenged finding of fact VII addresses the northern setback along S.E. 6th as follows:

> In order to reduce the intrusion of the hotel into the wetlands, City staff had recommended little or no setback from the street line on the S.E. 6th side. The City Council, apparently weighing street esthetics more heavily, required a 20 foot setback from the street, at the cost of greater intrusion into the wetland.

This finding supports challenged finding XI. Finding XI should be affirmed.

The majority also holds the Board erred legally with respect to the setback along S.E. 6th because it failed to identify a specific regulation in Bellevue's Master Program giving shorelines priority over setbacks.[49] In light of the previously quoted policies of the Act and the Bellevue Shoreline Master Program, I would hold no specific regulation is needed to establish that shorelines of statewide significance have priority over street setbacks. If Bellevue was unprepared to sacrifice its interest in the aesthetic appearance of S.E. 6th, its alternative was to deny the project, not to sacrifice the wetlands.

The majority contends the setback issue was conclusively resolved earlier by the City's decision to grant a conditional use permit, and therefore was not before the Board and was inadequately documented in the record.[50] I disagree. The shoreline substantial development permit incorporated

---

[47]*See* Tr. of Proceedings, at 341, Day Two, testimony of project architect Bob Wells: "They [Bellevue City Council] were balancing esthetics from the street with wetland coverage and balanced all kinds of things and that's just the way that one came out."

[48]Ex. 8 (Hr'g Examiner's finding of fact 29).

[49]Majority, at 759-60.

[50]Majority, at 758.

the conditions of approval provided by the conditional use permit, and therefore an appeal of the substantial development permit put at issue the conditions of the conditional use permit that impact the shoreline.[51] The presiding member of the Board specifically referred to lot coverage issues at the beginning of the first day of proceedings,[52] and the record contains voluminous staff reports and other evidence detailing the evolution of the setback requirement.

FINDING IX. Overlake developed a mitigation plan after consultation with the Department of Ecology. The Board summarized the evidence concerning this plan in its Finding IX:

> As a result of the City's and Ecology's required mitigation of wetland impacts, some trees would be planted near the hotel, and other enhancements, mostly in the form of vegetation, would be made, not to the wetland adjacent to the hotel, but to the main portion of the Mercer Slough wetland many blocks to the south.

The Board concluded as a matter of law that "the wetland mitigation plan proposed fails to fully mitigate the impacts on the wetland of the development, and most particularly fails to mitigate impacts on the Sturdevant Creek portion of the wetland system,"[53] and "the wetland mitigation proposed fails to compensate for the adverse effects of the project."[54] The majority opinion does not address the mitigation issue, but Overlake vigorously challenges these conclusions of law.

As framed by Bellevue's Master Program policies, the material issue was whether "measures can be satisfactorily

---

[51]*See* Br. of Resp't Shorelines Hr'gs Bd., at 11.

[52]"Design issues are on the table because this board has power to condition permits . . . so please, if you have information that you feel the board should know which would advise against conditioning a permit on the height and lot coverage issues, please make sure you present it[.]" Tr. of Proceedings, at 41, Day One.

[53]Conclusion of Law X.

[54]Conclusion of Law XIII.

undertaken to mitigate all related adverse impacts."[55] Finding XI, unchallenged by Overlake in its appeal, establishes that the proposed mitigation fails to compensate on-site for the project's adverse impacts.[56] Further, evidence in the record depicted the proposed off-site mitigation as uncertain in success.[57] And Overlake's evidence introduced to demonstrate the wetland's insignificance as a habitat for wildlife was far from overwhelming, in that the inventory was not thorough.[58] The Board's expertise is particularly adapted to evaluating such evidence. From the entire rec-

---

[55]BSMP Policy 21.U.056.

[56]The Board's finding is supported by the opinion testimony of Erik Stockdale and the related Exhibit A-27, a letter which reads in part: "The additional fragmentation of this wetland cannot be mitigated, period. The fact that there are no restoration/creation options available in the project area is an indication of the cumulative impacts that have already occurred to the wetlands in this reach of the watershed."

Overlake describes Stockdale's opinion as "supplanted" by the Department of Ecology's acceptance of Overlake's Mitigation Plan, but provides no authority for disregarding Stockdale's opinion. Appellant Overlake's Opening Br., at A-40. Notwithstanding Ecology's official approval of the mitigation plan, the Board was entitled to accept Stockdale's professional opinion that the project "will result in a net loss of wetland functions". Ex. A-27. *And see* Tr. of Proceedings, at 120-21, Day One.

Despite the applicant's depiction of the wetland as one "most of us wouldn't mind losing" because it is uselessly devoted to canary grass, *see* Tr. of Proceedings, at 411, Day Three, other evidence includes a letter from the Department of Ecology pointing out that the wetland is part of Mercer Slough's "very high quality peat wetland system" in which canary grass is not typical. Ex. R-2, at 1. *See also* Tr. of Proceedings, at 477, Day Three (testimony of project proponent Boule, agreeing that in the long run the loss of canary grass means a loss of other forms of vegetation that would become established in the long term).

[57]*See, e.g.*, Ex. A-27. The letter exhibit states in part:

The flood storage function of the wetland is proposed to be mitigated on site. The water quality improvement function of the wetland, however, will not be properly mitigated. The mitigation plan proposes to plant several ditches in an old blueberry farm with plant species that attenuate pollutants, totaling 0.08 acres. There is no indication that this will adequately replace the water quality function that the 0.82 acres portion presently provides.

*See also* Ex. R-2; Tr. of Proceedings, at 374-75, Day Two (Bellevue administrator Matthew Terry testifying that the mitigation plan proposes to add vegetation to a pond not yet in existence).

[58]*See* Tr. of Proceedings, at 512, Day Three (testimony of wildlife ecologist Rector).

ord, an unprejudiced, thinking mind could conclude that measures could not be "satisfactorily undertaken to mitigate all related adverse impacts"[59] and that there would be a net loss of wetland functions. I would therefore hold the Board did not err in concluding the mitigation plan was inadequate.

I also observe that the first of Bidwell's issues identified in the prehearing order states, "Does the permittee's proposed wetland mitigation plan adequately compensate for the project's adverse impacts on shoreline wetlands at the site?"[60] Bidwell did introduce considerable evidence on this topic, and Overlake's witnesses supplied more evidence in response to questions from the Board. I therefore believe the majority is inaccurate in its assertion that Bidwell focused only on the height issue and failed to develop an adequate record for the findings pertaining to the substantial development permit.

## "REASONABLE USE" DICTA

The majority is convinced that the Board's stated reasons for altering the permit are but a smokescreen for its "real reason"[61] or "true attitude"[62]—a belief that the proposed hotel was not a reasonable use for the small sliver of dry land on the subject parcel. The majority uses the Board's comment on reasonable use as a basis to conclude the Board allowed "its ability to look objectively at the evidence"[63] to be affected.

This is certainly a mischaracterization of the Board's decision-making process. First, the Board's comment questioning reasonable use was straightforward dicta, unnecessary to its decision but useful in showing what its decision on the height variance was *not* based on. When the

---

[59]BSMP Policy 21.U.056.

[60]Prehearing Order, SHB No. 93-87, at 1.

[61]Majority, at 760.

[62]Majority, at 761.

[63]*Id.*

Board used dicta about reasonable use to similar purpose in the decision upheld in *Buechel,* the Supreme Court did not fault the Board for doing so.[64] This court occasionally expresses its thoughts on issues that do not expressly constitute the basis of decision.[65] We should be very reluctant to infer that the similar use of dicta by a hearing board reveals a hidden and improper motive.

Second, the Board's statement about reasonable use is most fairly understood as illuminating its decision to grant the *height* variance—a decision not at issue in this appeal—not its decision to condition the substantial development permit. Only with respect to the height variance was "reasonable use" a specific criterion for decision. That is, Bidwell could have blocked the height variance if he had shown the project did not meet the five defined variance criteria, including "[t]hat the strict application of the . . . standards set forth in the applicable master program precludes or significantly interferes with a reasonable use of the property not otherwise prohibited by the master program."[66] But since Bidwell did not carry his burden of proof on any of the variance criteria, the Board—despite its reservations about reasonable use—affirmed the height variance.[67]

In short, the real reason the Board conditioned the substantial development permit is exactly as set forth in its decision—the development "violates the Shorelines Management Act and the Bellevue Shoreline Master Program in its extensive and unwarranted coverage of this wetland, and that the wetland mitigation proposed fails to compen-

---

[64]*Buechel,* 125 Wn.2d at 208.

[65]*See, e.g., Jefferson County,* 73 Wn. App. at 593 (Court of Appeals writes that although it has rejected Shorelines Hearing Board's decision because of errors of law in considering other factors, "there is certainly some merit" to the contention that "this project simply does not fit the area into which it would be inserted.").

[66]WAC 173-14-150(2)(a) (1995).

[67]Conclusion of Law XVII.

sate for the adverse effects of the project."[68] In speculating that the Board's remark about reasonable use betrays a lack of objectivity, the majority unnecessarily casts doubt on the Board's professionalism and thereby undermines the Board's authority.

Overlake and Bellevue raise a number of procedural issues with the Board's decision. Essentially, they argue they lacked fair notice of the issues decided by the Board. This argument is contradicted by the broad scope of the pre-hearing order, and by Bellevue's opening statement: "I think it's fair to characterize our debate over the substantial development permit . . . as a debate over the wetland impacts and the impacts to Mercer Slough that this project could pose."[69] I see no merit to the procedural issues.

In summary, the Board acted within the law and its own expertise in ordering that Overlake's hotel project should proceed only if redesigned so as not to intrude into the wetland. The Board's decision is well supported in the record. I would affirm the judgment of the superior court.

---

[68]Conclusion of Law XIII.

[69]Tr. of Proceedings, at 28, Day One.