[No. 61901-8.    En Banc.    October 5, 1995.]

JOAN K. HEINMILLER, *Appellant*, v. THE DEPARTMENT
OF HEALTH, *Respondent*.

596

*Joan K. Heinmiller*, pro se; *Perkins Coie*, by *Ronald M. Gould*; and *Law Offices of Monte E. Hester*, by *Monte E. Hester*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Margaret Bichl, Assistant*, for respondent.

DOLLIVER, J. — Appellant Joan Heinmiller (Heinmiller) challenges the Department of Health's decision to indefinitely suspend her social worker license because she engaged in a sexual relationship with a patient. The Department's decision is predicated upon its conclusion that the relationship constitutes unprofessional conduct within the meaning of provisions (1), (2), (22), and (24) of RCW 18.130.180 (Uniform Disciplinary Act).

In 1985, Heinmiller was a social worker and counselor in private practice, who performed counseling services for Valley Cities Mental Health Center under a service contract. In November of that year, Valley Cities assigned Heinmiller a female patient, M.B., who had complained of panic attacks. Through counseling, M.B. wanted to "sort out" concerns about her parenting skills and her relationships with her mother and boyfriend. M.B. began to meet with Heinmiller weekly starting on November 13, 1985.

During her therapy sessions M.B. persistently complained that she was unable to forge positive relationships with men. She indicated, however, that she had experienced "unique, warm, intimate, and supportive relationships with women." Finding of Fact 1.16. During a session on May 14, 1986, Heinmiller asked M.B. if she had ever explored the possibility that she might be a lesbian. M.B. responded by indicating that she would not identify herself as a lesbian and that she was not physically attracted to women. However, after the May 14, 1986, session M.B.

began to develop a romantic interest in Heinmiller. That interest later evolved into a sexual interest. Although she did not inform Heinmiller of these emerging feelings, M.B. began to see sexual innuendos in Heinmiller's actions and language during therapy sessions.

During the June 11, 1986 session Heinmiller suggested to M.B. that the two become friends after their therapist-patient relationship ended. Subsequently, M.B. began to envision herself in a romantic relationship with Heinmiller. During a session on July 23, 1986, M.B. and Heinmiller agreed that the next session would be the final one. They also discussed activities in which the two would participate jointly after the therapy sessions ended and their social relationship began.

Three weeks later, on August 14, 1986, M.B. recorded an audio tape in which she detailed the feelings she had developed for Heinmiller over the previous months of therapy. After listening to the tape, Heinmiller noted that she believed it indicated that therapy had helped M.B., who now recognized her as a human being, and not merely a therapist. In response to the tape, Heinmiller wrote M.B. the following note, dated August 17, 1986:

> Precious [M.B.]:
>
> After the sound of your words on my being, I have been subdued and thoughtful-perhaps fuller than I was. I suppose I should be able to live without it - not what for once in my life I have heard someone speak truths that have touched my life with all the richness and rightness I crave - but must I? Will you truly allow me to continue receiving and interacting with your magnificent appreciation of this universe? You cannot possibly know how I marvel at you and your gift to me. I really must have you in my life - not to mention need when I consider responsibilities that might lie ahead. Now, as I think it might often be, I quietly anticipate our next meeting.
>
> Joan

Finding of Fact 1.45.

M.B.'s final counseling session took place on August 27,

1986. At that session, Heinmiller expressed her need to have M.B. as a friend. The conversation at the session was "exceedingly intimate with sexual overtones . . . ." Finding of Fact 1.49. The two agreed to meet socially the next day.

The following day, August 28, 1986, Heinmiller and M.B. met at Saltwater State Park. After hours of walking, talking, and exchanging intimate thoughts, Heinmiller revealed to M.B. that she was a lesbian. Subsequently, M.B. disclosed that she was in love with Heinmiller and had physical yearnings for her. Later that day the two became involved physically.

Throughout the following two-year period they maintained a sexual relationship. M.B. eventually began to believe the relationship abusive and ended it in August 1988. Shortly thereafter, she visited the Abused and Battered Lesbian Association where she was told that she had been abused by Heinmiller. She subsequently returned to therapy with another therapist.

In September 1989, M.B. filed a malpractice action against Heinmiller. That suit was eventually settled. Less than one year later, in July 1990, she filed a complaint against Heinmiller with the Department of Health (Department). On July 20, 1990, the Department notified Heinmiller about that complaint. Throughout 1990, Heinmiller wrote a number of long letters to M.B. suggesting reconciliation. Many of the letters written after July 1990, including those dated August 11, August 27, October 28, and Thanksgiving, contained disparaging statements about M.B.'s then current therapists and attorneys. M.B. felt threatened and frightened by these letters.

On July 19, 1991, the Director for Professional Licensing Services of the Department of Health (Director) filed a statement of charges against Heinmiller. In that pleading, the Director alleged that Heinmiller had engaged in unprofessional conduct pursuant to provisions (1), (2), (4), (22), and (24) of RCW 18.130.180. In February, April, and May 1992, the Department of Health held a hearing before

an Administrative Law Judge (ALJ) to determine whether Heinmiller had in fact engaged in unprofessional conduct as defined by those provisions. On September 25, 1992, the ALJ ruled that Heinmiller had engaged in unprofessional conduct within the meaning of provisions (1), (2), (22), and (24) of RCW 18.130.180, but not provision (4) of that statute. Consequently, the ALJ ordered the suspension of Heinmiller's social worker license for three years, and the imposition of a $1,000 fine. That order, however, permitted a stay of the suspension if Heinmiller informed those clinics with which she was associated about her status, did not treat patients with sexual identity problems, and did not violate in any way either RCW 18.130.180 or RCW 18.19, which regulates counselors.

On November 18, 1992, Heinmiller moved to have the ALJ's order reviewed. On that same day, the Director made a similar motion. On March 31, 1993, a Department of Health review judge affirmed the ALJ's ruling that Heinmiller had engaged in unprofessional conduct under provisions (1), (2), (22), and (24) of RCW 18.130.180. That judge, however, modified the ALJ's sanctions. Instead of the previously described three-year suspension and conditional stay, the review judge ordered an indefinite suspension which can be stayed only if Heinmiller submits to the Department: a detailed plan of her proposed practice, a current psychological evaluation by a licensed professional approved by the Department's Counselor Program, and a certificate verifying her completion of thirty hours of education on therapist-patient boundary issues. Moreover, the review judge's order also conditions reinstatement of Heinmiller's license upon her completion of three consecutive years of satisfactory practice under the supervision of a Counselor Program-approved mental health care professional. Furthermore, the order renders her ineligible for reinstatement until a period of six years has elapsed from the date of entry of the order.

On April 27, 1993, Heinmiller appealed the review judge's order to King County Superior Court. That court

affirmed the order on May 10, 1994. Subsequently, Heinmiller appealed to this court.

■ ■ Judicial review of a final administrative decision is governed by the Washington 1988 Administrative Procedure Act (WAPA) (RCW 34.05). "In reviewing administrative action, this court sits in the same position as the superior court, applying the standards of the WAPA directly to the record before the agency." *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). To the extent that they modify or replace the ALJ's findings of fact and conclusions of law, the review judge's findings and conclusions are relevant on appeal. *Tapper*, 122 Wn.2d at 406.

■ An agency's conclusion of law can be modified if "[t]he agency has erroneously interpreted or applied the law." RCW 34.05.570(3)(d). "Under this standard, we accord substantial weight to the agency's interpretation of the law, although we may substitute our judgment for that of the agency." *Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991); see *St. Francis Extended Health Care v. Department of Social & Health Servs.*, 115 Wn.2d 690, 695, 801 P.2d 212 (1990).

I

Under provision (2) of RCW 18.130.180, the "[m]isrepresentation or concealment of a material fact in obtaining a license or in reinstatement thereof" constitutes unprofessional conduct. In October 1988, Heinmiller filed an application with the Department of Licensing, requesting certification as a social worker. The application contained the following question:

WITHIN THE PAST TEN YEARS, HAVE YOU ENGAGED IN ANY OF THE CONDUCT DESCRIBED IN THE UNIFORM DISCIPLINARY ACT, 18.130.180 RCW, EXCLUDING THE CONDUCT DESCRIBED IN 18.130.180(6) AND 18.130.180(23)?

Finding of Fact 1.2. Heinmiller answered this question in

the negative. The review judge concluded that in so doing, Heinmiller had misrepresented or concealed, within the meaning of RCW 18.130.180(2), the material fact of her sexual relationship with M.B. The judge concluded as a matter of law that:

> [Heinmiller] knew or *should have known* that her negative response to the application question was false and that information concerning her counseling and social relationships with M.B. was material to the Counselor Program's determination of her qualifications and fitness to practice counseling and social work.

(Italics ours.) Conclusion of Law 2.42.

Heinmiller assigns error to this conclusion of law. First, she asserts that she did not actually know that her sexual relationship with M.B. was a material fact that could bear upon the Department's decision to issue her a license. Second, she maintains that even assuming arguendo that she "should have known" the relationship constituted such a material fact, she cannot be found to have misrepresented or concealed that relationship on her license application because constructive knowledge of a fact's materiality is an insufficient basis for a finding of misrepresentation or concealment within the meaning of RCW 18.130.180(2). We disagree.

■ Heinmiller draws support for her position primarily from the definitions of "misrepresentation" and "concealment" provided in the dictionary. Admittedly, those definitions suggest that "misrepresentation" and "concealment" presuppose actual knowledge. *See* BLACK'S LAW DICTIONARY 1001, 289 (6th ed. 1990). Courts are permitted to "resort to dictionaries to ascertain the common meaning of statutory language." *Garrison v. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976). However, they are not necessarily bound by those definitions.

■■ The goal of the Uniform Disciplinary Act, of which RCW 18.130.180 is a part, is to protect the public from the hazards of health care professional incompetence and

misconduct. *See* RCW 18.130.010. Disciplinary action is the tool provided by the Act for the achievement of this goal. *See* RCW 18.130.160. Misconduct is not less harmful to the public simply because the professional who engages in it fails to recognize it as such. Therefore, the imposition of discipline cannot be limited to those situations in which professionals have actual knowledge of the inappropriateness of their actions.

In *Tomlinson v. State*, 51 Wn. App. 472, 479-80, 754 P.2d 109 (1988), the Court of Appeals sanctioned the disciplinary action of a dentist despite the fact that he was unaware that his conduct was improper. The *Tomlinson* court upheld an agency's decision to suspend the license of a dentist who inadvertently failed to comply with a regulation requiring such a professional to report the hospitalization of a patient.

Even before the Legislature enacted the Uniform Disciplinary Act in 1984, this court suggested that a professional who behaves improperly is subject to disciplinary action even if that professional was unaware of the impropriety of the conduct. *See In re Flynn*, 52 Wn.2d 589, 328 P.2d 150 (1958). In *Flynn*, a dentist unknowingly hired an unlicensed dentist as an employee. The court explained that

> the inadvertent or negligent hiring of a nonlicensed dentist is reprehensible and a proper subject for disciplinary proceedings in order to prevent its repetition by the licensed dentist and to maintain the integrity of the licensing system.. . .

*Flynn*, 52 Wn.2d at 595-96.

The provisions of RCW 18.130.180 must be interpreted so as to preserve the integrity of the notion that a professional is subject to discipline for misconduct irrespective of that professional's actual knowledge of the impropriety of the conduct. Heinmiller's interpretation of provision (2), however, would function to subvert that notion, thus compromising public safety. Under Heinmiller's narrow construction of the provision, disciplinary action would be

permitted only if the professional had actual knowledge at the time the license application was filled out that the conduct omitted from the application was improper. We therefore reject Heinmiller's construction of RCW 18.130.180(2) and hold instead that a professional has misrepresented or concealed material conduct if that professional possesses either actual knowledge or constructive knowledge that the conduct is improper and hence material to a licensing decision.

The Department found that when Heinmiller filled out her license application in October 1988 she had constructive knowledge that her sexual relationship with M.B. constituted material conduct bearing upon the Department's decision to grant her a license. Accordingly, regardless of whether Heinmiller had actual knowledge that the sexual relationship was material, the Department did not improperly conclude that she misrepresented or concealed the relationship on her license application.

## II

■ Although Heinmiller's sexual misconduct occurred prior to the application of RCW 18.130.180(1) and (24) to counselors, the Department properly considered whether that conduct would have violated those sections as evidence of a material fact she should have disclosed under RCW 18.130.180(2). Under provision (1) of RCW 18.130.180, "[t]he commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession" constitutes unprofessional conduct. The Department concluded that Heinmiller committed an act of moral turpitude within the meaning of this provision by engaging in a sexual relationship with M.B. Heinmiller assigns error to this conclusion of law, claiming that the phrase "moral turpitude" as used in RCW 18.130 .180(1) is unconstitutionally vague as applied to her. This argument lacks merit.

In *Haley v. Medical Disciplinary Bd., supra*, this court was presented with the identical argument on similar facts. We stated that

the term "moral turpitude", standing alone and unapplied, has a meaning difficult to fathom. Reading RCW 18.130.180(1) as a whole . . . we interpret the statute as prohibiting conduct indicating unfitness to practice the profession. . . .

*Haley*, 117 Wn.2d at 742. Furthermore, noted the *Haley* court, whether particular conduct renders a professional unfit to practice is determined in light of the purpose of professional discipline and "the common knowledge and understanding of members of the particular profession . . . ." *Haley*, 117 Wn.2d at 743.

The primary purpose of professional discipline is to protect the public. *Haley*, 117 Wn.2d at 743; *see* RCW 18.130.010. The public is endangered by a particular social worker if that social worker has engaged in behavior considered to be unacceptable by the reasonable social worker. The critical inquiry in the present case is therefore whether it is the common understanding among social workers that a sexual relationship between a social worker and a former patient, which begins one day after the termination of the formal therapist-patient relationship, constitutes unacceptable behavior. Such is a question of fact for the trier of fact. After reviewing the evidence, the trier of fact in the instant case, the Department, answered that question in the affirmative. It noted:

> Dr. Fink testified that the standard of care governing therapists during 1985 and 1986 was that a therapist and a client could not have social contact for a minimum of two years after the discontinuance of therapy.. . . [T]estimony at the hearing showed that the 1980 Code Of Ethics of the National Association of Social Workers clearly prohibited sexual activities with clients under all circumstances.

Finding of Fact 1.110. In light of this factual finding, the Department did not improperly conclude that Heinmiller's conduct constitutes moral turpitude within the meaning of RCW 18.130.180(1) and renders her unfit to practice social work.

## III

Under provision (24) of RCW 18.130.180, "sexual contact with a client or patient" constitutes unprofessional conduct. The Department concluded that the sexual relationship between Heinmiller and M.B. constitutes sexual

contact with a patient within the meaning of this provision. Heinmiller assigns error to this conclusion, contending that the sexual relationship at issue is not proscribed by this provision because M.B. was a former patient, not a current patient, when the relationship began. We reject this argument in light of the *Haley* court's explanation of the scope of the provision.

In *Haley*, a physician began a sexual relationship with a former patient a number of months after the physician-patient relationship terminated. Although the court declined to find sexual contact within the meaning of RCW 18.130.180(24), it expressly stated that

> were Dr. Haley a family physician, a psychiatrist, an internist, an oncologist, or almost any other type of physician who typically has an *ongoing relationship* with patients, we would conclude — under facts otherwise similar to those before us — that the physician had engaged in sexual contact with a patient.

(Italics ours.) *Haley*, 117 Wn.2d at 730. A social worker, like a family physician, psychiatrist, internist, or oncologist, is involved in an ongoing relationship with a patient. Therefore, in accordance with *Haley*, a social worker who begins a sexual relationship with a patient the day after the formal therapist-patient relationship ends falls within the purview of RCW 18.130.180(24).

## IV

Provision (22) of RCW 18.130.180 deems unprofessional conduct any

> [i]nterference with an investigation or disciplinary proceeding by willful misrepresentation of facts before the disciplining authority or its authorized representative, or by the use of threats or harassment against any patient or witness to prevent them from providing evidence in a disciplinary proceeding or any other legal action[.]

The Department concluded that Heinmiller sent threatening and harassing letters to M.B. in order to discourage

her from pursuing her complaint. Heinmiller assigns error to this conclusion of law, claiming that the finding of fact upon which it rests is unsupportable. We disagree. The conclusion is based upon the Department's factual finding that:

> [Heinmiller's] letters to M.B. contain repeated derogatory opinions and statements about M.B.'s therapists, evaluator and attorney and were clearly intended to discredit the advice and opinions of these individuals in M.B.'s mind. Although [Heinmiller] denies that the letters were meant to harass or threaten M.B., the language and tone of the letters themselves reject [Heinmiller's] claims of denial.

Finding of Fact 1.100.

A court can reverse an agency finding of fact if the finding "is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ." RCW 34.05.570(3)(e). "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises'." *Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994) (quoting *Olmstead v. Department of Health*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991)). Heinmiller argues that the purpose of the letters at issue was not to threaten and harass M.B., but rather to express "love and concern" for her. The facts do not support this contention.

It is undisputed that on July 20, 1990, Heinmiller discovered that M.B. had filed a complaint against her with the Department of Health. Less than one month later, on August 11, 1990, Heinmiller wrote M.B. a letter containing the following passage:

> You can show this to your therapists (I hope you do) and your entire bloodthirsty, scapegoating network. They are free to continue to try to stone me in the streets (which is precisely the same as trying to destroy my career, my financial footing and ongoing relationship to you.) But that stoning will not alter reality or my integrity. It will ultimately shame and demean them. And it will ultimately sicken and devastate you.. . .

Clerk's Papers at 1400. On October 28, 1990, Heinmiller

wrote M.B. yet another letter. That letter contained the following passages:

> (Did you know that [the lawyer] and his wife have questionable reputations in the legal community! One attorney—a managing partner of a lawfirm—told me [the lawyer] has a reputation for filing "non-meritorious cases." And a full partner of another lawfirm told me that "everybody knows about [the lawyer] and his wife.")

Clerk's Papers at 1421-22.

> You are not going to collect money or destroy my reputation because you had a traumatic experience during orgasm— nearly two years after termination of great therapy. You are not going to be supported in reinforcing incompetent therapists, and opportunistic "experts" or lawyer. In case you haven't noticed, I have continued to be rather successful at preventing the withholding of defense. How? because I know what I am talking about and I know my rights as well as seeking the assistance of broader resources than "a lawyer." I want to tell you something more. I believe this whole thing has gotten so out of hand and is so self-serving on the part of your therapists, "experts" and lawyer that it amounts to CONSPIRACY TO OBSTRUCT JUSTICE AND TO COMMIT FRAUD. I have stated so and submitted that opinion to the State of Washington—two separate entities.

Clerk's Papers at 1425. In her most damning and incriminating letter to M.B., dated Thanksgiving 1990, Heinmiller wrote:

> And when I have been exonerated and your cohorts have been exposed for what they are, I am going to publish a book. I already have considerable content as well as the title—no joke—THERAPIST BASHING: FOR POWER, PROFIT AND CHATHARSIS [sic] by Joan K. Heinmiller MSW, ACSW; an autobiographical account. You want to bet that my effort at discretion regarding our evolving lesbian relationship was only my selfish effort at "swearing you to secrecy?" I wonder how it will feel to all of you to have your lesbianism and/or incestuous ulterior motives publicly scrutinized. I wonder how you will feel as a certified preschool teacher seeking employment after this whole mess is pressed through the legal sieve at your inauguration. I have virtually nothing to lose and everything to gain. I have made peace with myself, what about the rest of you?

Finding of Fact 1.98. These letters provide ample evidence to support the Department's factual finding. Two expert witnesses testified at the hearing that Heinmiller wrote the letters from which these passages derive out of concern and love for M.B. However, the Department exercised its prerogative as a fact finder not to afford credence to the opinion of these witnesses.

V

RCW 18.130.160 provides:

> Upon a finding, after hearing, that a license holder or applicant has committed unprofessional conduct or is unable to practice with reasonable skill and safety due to a physical or mental condition, the disciplining authority may issue an order providing for one or any combination of the following:
>
> . . .
>
> (2) Suspension of the license for a fixed or indefinite term;
>
> . . .
>
> (4) Requiring the satisfactory completion of a specific program of remedial education or treatment;
>
> (5) The monitoring of the practice by a supervisor approved by the disciplining authority[.]

A court can reverse an agency order if "[t]he order is arbitrary or capricious." RCW 34.05.570(3)(i). Heinmiller submits that the sanctions imposed upon her by the Department are rendered arbitrary and capricious by their harshness. Harshness, however, is not the test for arbitrary and capricious action.

> Arbitrary and capricious action has been defined as willful and unreasoning action, without consideration and in disregard of facts and circumstances. Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.

*Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983) (quoting *State v. Rowe*, 93 Wn.2d 277, 284, 609 P.2d 1348 (1980)).

Action taken after giving respondent ample opportunity to be

heard, exercised honestly and upon due consideration, even though it may be believed an erroneous decision has been reached, is not arbitrary or capricious.

*Washington Medical Disciplinary Bd. v. Johnston*, 99 Wn.2d 467, 483, 663 P.2d 457 (1983) (citing *Washington State Employees Ass'n v. Cleary*, 86 Wn.2d 124, 542 P.2d 1249 (1975)).

In a recent opinion, *Keene v. Board of Accountancy*, 77 Wn. App. 849, 894 P.2d 582 (1995), the Court of Appeals was presented with the harshness argument currently before this court. In *Keene*, the State Board of Accountancy suspended an accountant's license to practice accounting for a period of five years, attaching certain conditions to its reinstatement at the end of that period. The Court of Appeals acknowledged the harshness of the sanctions, but declined to find them arbitrary and capricious because "the action was not taken without due consideration." *Keene*, 77 Wn. App. at 860.

The review judge imposed the previously described sanctions after a fair hearing at which the facts were considered and Heinmiller had an opportunity to present her arguments. It therefore cannot be said that those sanctions resulted from willful and unreasoning action. Neither can it be said that they are not necessary to protect the public. "In determining what action is appropriate, the disciplining authority must . . . consider what sanctions are necessary to protect . . . the public." RCW 18.130.160. It is not unreasonable to prohibit a therapist who engaged in a sexual relationship with a patient from treating patients until she has demonstrated that she will not in the future lead another patient into such a relationship. This holds true whether the patient is female or male.

Affirmed.

DURHAM, C.J., and SMITH, GUY, MADSEN, and TALMADGE, JJ., concur.

PEKELIS, J. (concurring) — I concur in the majority's decision to uphold the Department of Health's (Department) conclusion that Heinmiller violated subsection (22) of the Uniform Disciplinary Act (UDA), by sending threatening and harassing letters to her former client. Heinmiller sent the letters to M.B. at a time when her professional conduct was governed by the UDA. However, in my opinion, it is extremely problematic to discipline Heinmiller for violating subsection (2) of the UDA for allegedly misrepresenting her past conduct on her licensing application.

However, the Department also based its disciplinary action on Heinmiller's alleged misrepresentation or concealment of a material fact regarding this past conduct. In my view, this decision of the Department should not be upheld because it erroneously applied a constructive knowledge standard when determining that Heinmiller's failure to disclose her relationship with M.B. constituted a "[m]isrepresentation or concealment of a material fact in obtaining a license . . . ." RCW 18.130.180(2).

When Heinmiller applied for a counselor license and certification as a social worker, she was asked the following question:

> Within the past ten years, have you engaged in any of the conduct described in the Uniform Disciplinary Act, 18.130.180 RCW, excluding the conduct described in 18.130.180(6) and 18.130.180(23)?

Department of Health Review Judge's Findings of Fact (Dep't F of F) 1.2, CP at 10. She responded in the negative. Dep't F of F 1.2, CP at 10. The Department decided that this response constituted a misrepresentation because it was enough that Heinmiller "should have known" that her past conduct constituted an act of "moral turpitude"

and "sexual contact with a client" within the meaning of the UDA and thus required disclosure. Dep't C of L 2.42, CP at 64. In my opinion, however, both the plain language of the statute and the dictates of fair play require that applicants such as Heinmiller have *actual* knowledge of the falsity of a response before they can be disciplined for misrepresentation.

Absent some ambiguity, courts must give words in a statute their common meaning. *E.g., Department of Licensing v. Lax*, 125 Wn.2d 818, 822, 888 P.2d 1190 (1995). The majority acknowledges that dictionary definitions of "misrepresentation" and "concealment" suggest that the declarant must have actual knowledge of the material fact in question. *See* BLACK'S LAW DICTIONARY 1001, 289 (6th ed. 1990). Majority at 602. They also recognize the utility of dictionaries in ascertaining the common meaning of statutory language. *See Garrison v. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976). Majority at 602. Nevertheless, the majority concludes that, as applied to this statute, the common meanings of "misrepresentation" and "concealment" are unsatisfactory.

The majority struggles to circumvent the plain meaning of "misrepresentation" and "concealment" apparently out of fear that a constructive knowledge standard is necessary to ensure that the public is protected from professional incompetence and misconduct. This fear is misplaced.

There is no question that the Department can refuse to license a social worker whose prior track record demonstrates that she is not fit to practice her profession. RCW 18.19.050(1). However, when this is done not because of the person's past conduct, but based on answers to questions, two basic requirements should be met. First, the questions should be directed to objective facts about which

there can be little doubt. It is far better to ask, "Have you ever been arrested or charged with a crime?" than to ask, "Have you ever engaged in an act of moral turpitude?" Well crafted questions would focus an applicant's attention on the specific conduct requiring disclosure and would be more likely to elicit responses which will alert officials to the need for an in-depth investigation before granting a license. This would do more to protect the public from unfit professionals than does requiring applicants to reflect on whether their own behavior constitutes an act of "moral turpitude."

Second, to discipline a person not because she knew, but because she *should* have known, that her conduct would be deemed by others to constitute an act of "moral turpitude" makes the Department's action almost Kafkaesque. What constitutes an act of "moral turpitude" is difficult to ascertain with any precision. Asking an applicant to evaluate her past conduct by such an amorphous concept merely sets a trap which can snare even applicants who attempt to be forthright and honest in their responses. It does nothing to protect the public from unfit applicants.

The inequities created by using a constructive knowledge definition for "misrepresentation" are even more sharply demonstrated by analyzing the Department's determination that Heinmiller "should have known" that M.B. was still her client when they first had sexual contact. There is some evidence to support the Department's finding that the social worker/client relationship continued, but at the same time there is evidence that the relationship had ended. Heinmiller and M.B. mutually agreed to end their professional relationship before they had sexual contact. At that point, all formal indicia of a professional relationship were terminated and never resumed. There were no further appointments or payment for services and Heinmiller and M.B. no longer held

themselves out as having a current professional relationship. It is, thus, understandable how, in total good faith, Heinmiller could answer in the negative when asked whether she had sexual contact with a client.[1]

If the Department wishes to discipline persons who have been issued a license but are later discovered to have engaged in unprofessional conduct, it can promulgate rules to that effect. RCW 18.19.050(1). Disciplining a person under subsection (2) of the UDA, however, should be reserved for those who have knowingly misrepresented information. This would ensure that subsection (2) is not used as a way for the Department to circumvent its own disciplinary rules, but is instead used as a tool for weeding out dishonest applicants.

For the foregoing reasons, I would adhere to the plain meaning of "misrepresentation" or "concealment" and require that applicants have actual knowledge of the falsity of a response before disciplining them under subsection (2) of the UDA.

JOHNSON and ALEXANDER, JJ., concur with PEKELIS, J.

After modification, further reconsideration denied January 31, 1996.

---

[1]A well written question on the application such as, "Have you ever had sexual contact with a client or former client?", would have focused Heinmiller's attention on the type of conduct which required disclosure.