121 P.3d 731 (2005)
David H. REGAN, d/b/a Metro Bail Bonds, Inc., Appellant,
v.
STATE of Washington DEPARTMENT OF LICENSING, Respondent.
No. 31848-2-II.
Court of Appeals of Washington, Division 2.
August 23, 2005.
Publication Ordered October 25, 2005.
*734 Donald Gene Grant, Grant & Elcock PLLC, Vancouver, WA, for Appellant.
Susan Sackett Danpullo, Office of the Attorney General, Martha Patricia Lantz, Offc. of Atty. Gen. Lic & Admin. Law Div., Olympia, WA, for Respondent.
HUNT, J.
¶ 1 David Regan and Metro Bail Bonds (Regan) appeal an order of the Director of the Department of Licensing (DOL) finding that Regan aided and abetted unlicensed bail bond activity and revoking Regan's bail bond individual agent and agency licenses for five years. Regan argues that (1) the definition of "bail bond agent" in former RCW 18.185.010(6) (2000)[1] is unconstitutionally vague; (2) the Director erroneously interpreted former RCWs 18.185.010(6) and 18.185.110(10) (2000); (3) the record lacks substantial evidence to support the Director's order; and (4) the Director's order and disciplinary sanctions were arbitrary and capricious. We affirm.

FACTS

I. UNLICENSED BAIL BOND ACTIVITY
¶ 2 David Regan was a licensed bail bond agent and the president and sole shareholder of Metro Bail Bonds, Inc. Metro's principal office is in Vancouver, Washington; it has branch offices in Tacoma, Seattle, Yakima, and Spokane.

A. Patterson's Unlicensed Bail Bond Activity
¶ 3 Carmetrus Patterson worked for Metro as a bail bond negotiator[2] at three different times. From April through September 1999, she held a bail bond agent's license. From March 2000 through April 2001, she worked without a license, but she applied for a bail bond agent's license. When DOL requested additional information about her criminal history, she did not respond. DOL issued a Statement of Intent to Deny Patterson's application. Patterson failed to request a hearing, *735 and the Director entered a default order, denying her application and prohibiting her from applying for a bail bond agent's license for 20 months from May 24, 2000. Starting in late October 2001, she again worked as a negotiator.
¶ 4 Patterson applied to renew her bail bond agent's license, which application DOL received on November 1, 2001. Mary Haglund, the bail bonds program manager, called Metro's principal office and spoke with Elizabeth Regan.[3] Haglund informed Elizabeth Regan that Patterson was not eligible to apply for a bail bond agent's license until January 24, 2002, and that Metro could not have Patterson working in the Metro office.
¶ 5 That same day, Patterson called Haglund; Haglund repeated to Patterson that she could not perform the duties of a bail bond agent[4] and that she was ineligible to reapply for her license until January 24, 2002. Also that day, Elizabeth Regan told David Regan about her conversation with Haglund; she informed him that Patterson could not be licensed until January 24, 2002, and that Patterson could not write bail bonds without a license.
¶ 6 Shortly after her conversations with Elizabeth Regan and Patterson, Haglund received an anonymous phone call informing her that Metro was allowing unlicensed bail bond activity. Haglund called David Regan at Metro's principal office and told him that Patterson could not sell or issue bail bonds.
¶ 7 On November 27, 2001, Haglund sent David Regan a letter to follow up on her telephone calls. Regan received the certified letter on December 3, 2001. The letter repeated Haglund's admonition that Patterson could not perform the duties of a bail bond agent; the letter did not otherwise specify or elaborate on particular duties Patterson must avoid. No one from Metro contacted Haglund for clarification about what duties Patterson could or could not perform.
¶ 8 A few days after Haglund's conversation with David Regan, an individual[5] came to the DOL reception desk to complain about unlicensed bail bond activity at Metro. The individual gave Haglund documents from Metro's office, including negotiator schedules for November and December and daily production reports for November 16, 26, 27, and 28, 2001. The documents showed that (1) Patterson worked as the day agent, (2) she was the sole listed negotiator on six signature bonds and six deed-of-trust bonds, and (3) she had worked with another employee in negotiating three other bail bond transactions.

B. Undercover Bond Purchase
¶ 9 On December 21, 2001, Karen Roney, a DOL investigator, went undercover to Metro's Tacoma office to post a bond for a fictitious criminal defendant. Patterson confirmed the booking and gave Roney paperwork to complete to purchase a signature bond.[6] According to Roney, Patterson did not exercise discretion in selecting the forms, which were bundled together. At Metro's office, Roney observed Patterson serving other clients by (1) taking money, (2) issuing receipts, (3) instructing clients to go to the jail to bail out defendants, and (4) talking with a client about the return of collateral.
¶ 10 Patterson testified that, in deciding to issue a signature bond, she considered the amount of bail, Roney's employment, the defendant's charges and prior history, and whether the defendant had ever failed to appear. After Roney completed the paperwork, Patterson reviewed the documents with her. Roney paid $75 to Patterson. Patterson issued Roney a receipt and told her to ensure that the defendant appeared in *736 court and checked in with Metro within 24 hours. Patterson then gave the paper work to Trisha Uehara, a licensed bail bond agent, to execute the bond form and to post it at the jail.

II. PROCEDURE
¶ 11 On January 14, 2002, DOL served Regan and Metro with a Statement of Charges and Notice and Order of Summary Suspension alleging aiding or abetting unlicensed activity.[7] Regan and Metro requested a hearing.

A. Administrative Hearing
¶ 12 Patterson, Roney, and David Regan, among others, testified at the hearing before an Administrative Law Judge (ALJ). Regan testified that an agent's typical steps in selling or issuing a bail bond are (1) making contact with the client, (2) collecting the premium, (3) determining the size of the bond and assessing whether the transaction needs to be referred to a manager, (4) giving the client a pre-printed set of forms, (5) retrieving the forms from the client, and (6) issuing a receipt. He also testified that licensed bail bond agents perform various duties, including collecting premium payments, assisting customers with paperwork, and obtaining information from the jail, all of which duties Patterson performed during her transaction with Roney.
¶ 13 Regan further testified that after DOL contacted Metro about Patterson's license status, (1) he told her to stay in the back room to avoid public contact, and to act as a receptionist screening calls for licensed agents, and (2) he knew Patterson was still selling bonds in December 2001.
¶ 14 Patterson testified that (1) Regan never told her to stop selling or negotiating bail bonds, (2) he discussed her sales with her in January 2002, and (3) he reviewed production reports daily when they were faxed to Metro's Vancouver office.
¶ 15 Following the hearing, the ALJ issued an initial decision dismissing the charges and lifting the summary suspension of Metro's license. The ALJ specifically found (1) credible Regan's testimony that he had told Patterson to stay in the back room and not to be out in the front of the Metro office; and (2) not credible Patterson's denial that Regan or anyone else from Metro had told her not to sell or to negotiate bail bonds.

B. Review by Director
¶ 16 DOL petitioned for review by the Director, alleging factual and legal errors in the ALJ's decision. The Director issued an order reversing the ALJ and revoking both Regan's bail bond agent and Metro's agency licenses for five years. The Director made numerous modifications to the ALJ's findings of fact and conclusions of law.
¶ 17 Primary among these modifications was the Director's finding Regan's testimony, that he had instructed Patterson not to sell or to issue bonds, lacked credibility because it was inconsistent and contradictory. Specifically, Regan had testified that his understanding of the law was that Patterson was prohibited only from posting bail at the jail or signing bonds, but that she could perform all other duties. The Director noted:
If that was his understanding, his testimony that (following notice from the Department) he told Ms. Patterson to stay in the back room and not have any contact with customers does not make any sense. If Ms. Patterson was permitted to perform all the duties involved in negotiating a bond, but for signing and posting, why would she need to remain in the back room?
Administrative Record (AR) at 690.
¶ 18 The Director also relied on evidence in the record that Regan and other Metro employees met with Patterson to suggest she testify at her deposition that her job was called "service representative," rather than "bond negotiator," to take advantage of a perceived statutory loophole. The Director found such coaching indicated that Regan and Metro employees had a "motive or bias to present the facts in this proceeding in a prescribed manner." AR at 691. In contrast, *737 Patterson's testimony did not contain inconsistencies. And in light of DOL's charges against her, her testimony was also self-incriminating, thus indicating a lack of motive to misrepresent facts. These factors suggested that, where their testimonies conflicted, Patterson was more credible than Regan.

C. Judicial Review
¶ 19 Regan petitioned for judicial review. The superior court affirmed most of the Director's decision, but it remanded to the Director to reconsider the length of the license suspension. On remand, the Director reinstated the original five-year suspension.
¶ 20 Regan then requested judicial review of the Order on Remand, in response the superior court entered a final order affirming the Director's five-year sanction.
¶ 21 Regan appeals.

ANALYSIS

I. APA STANDARD OF REVIEW
¶ 22 In reviewing administrative actions, we apply Administrative Procedure Act (APA) standards directly to the record before the agency. Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993). We will grant relief from an agency order in an adjudicative proceeding if (1) the order, or the statute or rule on which the order is based, is unconstitutional on its face or as applied; (2) the agency engaged in an unlawful procedure or decision-making process, or failed to follow a prescribed procedure; (3) the agency erroneously interpreted or applied the law; (4) when viewed in light of the whole record, substantial evidence does not support the order; or (5) the order is arbitrary or capricious. RCW 34.05.570(3)(a),(c)-(e),(i). The party challenging an agency's action bears the burden of demonstrating its invalidity. RCW 34.05.570(1)(a).
¶ 23 Substantial evidence is sufficient to persuade a reasonable person of the truth of the declared premise. Penick v. Employment Sec. Dep't, 82 Wash.App. 30, 37, 917 P.2d 136, review denied, 130 Wash.2d 1004, 925 P.2d 989 (1996). We will not substitute our judgment on credibility of witnesses or the weight of conflicting evidence. Callecod v. Wash. State Patrol, 84 Wash.App. 663, 676 n. 9, 929 P.2d 510, review denied, 132 Wash.2d 1004, 939 P.2d 215 (1997). The Director must "give due regard" to the ALJ's "opportunity to observe the witnesses," RCW 34.05.464(4), but the Director is responsible for the final agency decision. See Tapper, 122 Wash.2d at 405-06, 858 P.2d 494.
¶ 24 To the extent that the Director's findings modified or replaced the ALJ's findings, we review only the Director's findings. Valentine v. Dep't of Licensing, 77 Wash.App. 838, 844, 894 P.2d 1352, review denied, 127 Wash.2d 1020, 904 P.2d 300 (1995). If, as here, a party fails properly to assign error to the findings of an administrative agency, they become verities on appeal. Shoreline Cmty. College Dist. No. 7 v. Employment Sec. Dep't, 59 Wash.App. 65, 70, 795 P.2d 1178 (1990), affirmed, 120 Wash.2d 394, 842 P.2d 938 (1992).
¶ 25 We review questions of law de novo. Tapper, 122 Wash.2d at 403, 858 P.2d 494. We give substantial weight to an agency's construction of statutory language and legislative intent where the statute, or code provision, falls within the agency's area of expertise. Macey v. Employment Sec. Dep't, 110 Wash.2d 308, 313, 752 P.2d 372 (1988).

II. VAGUENESS
¶ 26 Regan argues that former RCW 18.185.010(6) is unconstitutionally vague. Former RCW 18.185.010(6) defined "bail bond agent" as:
a person who is employed by a bail bond agency and engages in the sale or issuance of bail bonds, but does not mean a clerical, secretarial, or other support person who does not participate in the sale or issuance of bail bonds.
Regan argues that this statutory provision was unconstitutionally vague because it failed to specify what conduct constituted the "sale or issuance of bonds."[8] We disagree.

*738 A. Standard of Review
¶ 27 A statute is presumed constitutional. The burden is on the party challenging the statute to prove that it is unconstitutionally vague beyond a reasonable doubt. State v. Sullivan, 143 Wash.2d 162, 180, 19 P.3d 1012 (2001).
¶ 28 A statute is unconstitutionally vague if persons of common intelligence must guess at its meaning and differ as to its application. Sullivan, 143 Wash.2d at 182, 19 P.3d 1012. "If persons of ordinary intelligence can understand what the ordinance proscribes, notwithstanding some possible areas of disagreement, the ordinance is sufficiently definite." City of Spokane v. Douglass, 115 Wash.2d 171, 179, 795 P.2d 693 (1990).
¶ 29 A statute is not unconstitutionally vague merely because one cannot predict exactly when his or her conduct would be classified as prohibited. Sullivan, 143 Wash.2d at 184, 19 P.3d 1012. Nor is a statute unconstitutionally vague simply because some of its terms are vague or undefined. Sullivan, 143 Wash.2d at 184-85, 19 P.3d 1012; Haley v. Med. Disciplinary Bd., 117 Wash.2d 720, 741, 818 P.2d 1062 (1991).
¶ 30 We will not invalidate a statute simply because it could have been drafted with greater precision. Sullivan, 143 Wash.2d at 184, 19 P.3d 1012. Furthermore, "[d]ifficulty in determining whether certain marginal offenses are within the meaning of the language... does not automatically render a statute unconstitutional for indefiniteness." Haley, 117 Wash.2d at 740, 818 P.2d 1062 (quoting Jordan v. De George, 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951)). Rather, the Court has held that an ambiguous statutory term was not unconstitutionally vague where its meaning could be discerned from the statute as a whole as well as by referring to the common knowledge and understanding of members of the profession to which the statute applies. Haley, 117 Wash.2d at 742-43, 818 P.2d 1062. The Court further noted that "one to whose conduct a statute clearly applies may not challenge it on the grounds that it is vague as applied to the conduct of others." Haley, 117 Wash.2d at 740, 818 P.2d 1062. Such is the case here.

B. Common Knowledge and Understanding
¶ 31 Regan does not persuade us that a person of common intelligence must guess at the meaning of former RCW 18.185.010(6)'s plain definition of "bail bond agent" as one who "engages in the sale or issuance of bail bonds."
¶ 32 In Keene v. Bd. of Accountancy, 77 Wash.App. 849, 894 P.2d 582, review denied, 127 Wash.2d 1020, 904 P.2d 300 (1995), for example, we upheld sanctions against an accountant under the rule that "[a] licensee shall not concurrently engage in the practice of public accountancy and in any other business or occupation which impairs his independence or objectivity in rendering professional services." Keene, 77 Wash.App. at 855, 894 P.2d 582. We reasoned that the rule was "not void simply because it [did] not list every possible prohibited behavior." Keene, 77 Wash.App. at 855, 894 P.2d 582. Even though the rule did not provide an objective standard for judging the accountant's conduct, we held that common knowledge and understanding of other accountants provided adequate specificity. Keene, 77 Wash.App. at 856, 894 P.2d 582.
¶ 33 Assuming, without deciding, that the statute's definition of "bail bond agent" is vague, the record establishes that, as in Keene, common knowledge and understanding of the bail bond profession clearly encompasses Patterson's actions here. Regan testified that the typical steps in selling or issuing a bail bond consist of the agent's (1) making contact with the client; (2) collecting the premium; (3) determining the size of the bond and assessing whether the transaction needs to be referred to a manager; (4) giving the client a pre-printed set of forms; (5) *739 retrieving the forms from the client; and (6) issuing a receipt. Regan's understanding of the steps in a bail bond transaction substantially comports with Patterson's understanding, DOL's understanding,[9] and Patterson's actions. Regan, Patterson, and Roney all testified that Patterson engaged in some, if not all, of these bail-bond agent steps in her transaction with Roney.
¶ 34 Accordingly, we hold that former RCW 18.185.010(6) is not vague as applied to Patterson's actions with the Metro agency, for which Regan was the licensed agent.

III. DIRECTOR'S FINDINGS AND CONCLUSIONS

A. Interpretation and Application of Former RCW 18.185.010(6)
¶ 35 Regan argues that the Director erroneously concluded that Patterson engaged in the sale or issuance of bail bonds because Patterson performed nondiscretionary clerical or scrivener's acts, to which former RCW 18.185.010(6) did not apply. We disagree.
¶ 36 Regan relies on Perkins v. CTX Mortgage Co., 137 Wash.2d 93, 969 P.2d 93 (1999), in which the Supreme Court held that a mortgage company did not engage in the unauthorized practice of law when it allowed lay employees to participate in the preparation of legal documents, so long as employees did not exercise legal discretion and limited their participation to scrivening or clerical data entry. 137 Wash.2d at 105-06, 969 P.2d 93. Regardless of whether the definition of "bail bond agent" implicitly requires the exercise of discretion, the record here amply demonstrates that Patterson exercised discretion in her bail bond sales and issuance activities at Metro. Thus, her activities fall within the discretionary exception, which, as in Perkins, can serve as the basis for unauthorized practice.
¶ 37 Patterson testified that she exercised her judgment in deciding the amount of down payment to require of a bond customer, the type of collateral she would accept, and whether to permit multiple cosigners. Regan testified that bonds involving deeds of trust are particularly complex and require greater discretion. The daily production reports, which Regan reviewed, show that Patterson was the sole negotiator on multiple bonds involving deeds of trust. Furthermore, during her bail bond transaction with Roney, Patterson considered the amount of bail, Roney's employment, the defendant's charges and prior history, and whether the defendant had ever failed to appear in deciding to issue a signature bond. These acts clearly were not simple clerical or scrivener tasks.
¶ 38 On the contrary, Patterson's decisions and actions were discretionary, inherent in the issuance of bail bonds by a bail bond agent, whom the law requires to possess a license. Accordingly, we agree with the Director that former RCW 18.185.010(6) applied to Patterson's activities at Metro and, therefore, she illegally issued or sold bail bonds without a license.

B. Improper Rulemaking
¶ 39 Regan next argues that the Director engaged in improper rulemaking when he interpreted the phrases "bail bond agent" and "sale or issuance" of bail bonds under former RCW 18.185.010(6). Again, we disagree.
¶ 40 Under the APA, an agency must comply with certain procedures when promulgating a new rule. Budget Rent A Car Corp. v. Dep't of Licensing, 144 Wash.2d 889, 895, 31 P.3d 1174 (2001). "For rule making procedures to apply, an agency action or inaction must fall into the APA definition of a rule." Failor's Pharmacy v. Dep't of Soc. & Health Servs., 125 Wash.2d 488, 493, 886 P.2d 147 (1994). A rule is:

*740 any agency order, directive, or regulation of general applicability (a) the violation of which subjects a person to a penalty or administrative sanction; ... (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law.
RCW 34.05.010(16). The agency action at issue in interpreting statutory terms here, however, was not equivalent to promulgating a new rule.
¶ 41 In Budget Rent A Car, our Supreme Court held that DOL's interpretation of a statutory phrase, "total of all passenger cars in the fleet," did not establish, alter, or "revoke any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law"; thus, it was not improper rulemaking. 144 Wash.2d at 898, 31 P.3d 1174 (quoting RCW 34.05.010(16)). Noting that the APA was "not designed to serve as the straitjacket of administrative action," the Court reasoned that to hold otherwise,
would all but eliminate the ability of agencies to act in any manner during the course of an adjudication. The simplest and most rudimentary interpretation of a statute or regulation would require an agency to go through formal rule making procedures.
Budget Rent A Car, 144 Wash.2d at 898, 31 P.3d 1174.
¶ 42 Similarly, the Director's interpretation of "sale or issuance" here was not improper rulemaking. The Director interpreted selling or issuing a bond to include conducting the entire bail bond transaction or the performance of discrete tasks frequently included in the sale of bail bonds. Examples of such discrete tasks include, but are not limited to:
accepting the premium payment; assisting the customer with paperwork; contacting the jail to obtain the defendant's information; explaining the process to customers; issuing a receipt to the customer; deciding whether or not to issue a signature bail bond; examining collateral; deciding whether to accept certain collateral for a bail bond; meeting with the defendant after his release from jail; and releasing collateral to the indemnity.
AR at 698.[10] The Director's interpretation does not establish, alter, or revoke any qualification related to a benefit or privilege conferred by law; rather, it was a rudimentary interpretation of statutory language. See Budget Rent A Car, 144 Wash.2d at 898, 31 P.3d 1174.

C. "Aiding or Abetting"
¶ 43 Regan next argues that the Director erroneously applied former RCW 18.185.110(10) by interpreting the language "[a]iding or abetting an unlicensed person to practice" as imposing strict liability rather than using a traditional criminal theory of accomplice liability requiring intent. Regan further argues that there is insufficient evidence to show that he aided and abetted Patterson in her unlicensed bond sales. We disagree.

1. Interpretation of former RCW 18.185.110(10)
¶ 44 Former RCW 18.185.110(10) prohibited "[a]iding or abetting an unlicensed person to practice if a license is required" and authorized the Director to revoke any license as an appropriate disciplinary action. The statute did not define the terms "aiding or abetting."[11] The Director referred to the dictionary definitions of "aid" and "abet" to conclude that Regan both aided and abetted Patterson's unlicensed practice as a bail bond agent. The Director declined to read the criminal standard of accomplice liability into the statute.
*741 ¶ 45 We hold that the Director did not erroneously interpret or apply former RCW 18.185.110(10). We agree with the Director that it is unnecessary to read into the statute the criminal standard of accomplice liability. DOL did not charge Regan with violating a criminal statute.[12] As the Director noted,
[I]t would be inconsistent with the purpose of the statute to require proof of criminal intent for a license violation, and only require proof of employment of an unlicensed person to perform the duties of a bail bond agent for a criminal violation.
AR at 688-89 (footnote omitted). Such a reading of the statute would lead to the absurd result of a bail bond agency owner being convicted of a gross misdemeanor, yet avoiding liability for having engaged in, or allowing, prohibited conduct for licensing purposes. When interpreting statutes, we, like the Director, strive to avoid absurd results. State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003).
¶ 46 Regan has not assigned error to any of the Director's findings of fact under RAP 10.3.[13] Therefore, we treat the Director's findings as verities on appeal. See Shoreline Cmty. Coll., 59 Wash.App. at 70, 795 P.2d 1178 (findings made by the agency commissioner setting aside the ALJ's findings were verities on appeal where the party failed to assign error under RAP 10.3(g)).
¶ 47 Our review of the record and the Director's unchallenged finding of fact 15[14] support the Director's application of former RCW 18.185.110(10) to Regan. Regan (1) knew that Patterson was selling bonds in December 2001 and January 2002 without a license, (2) reviewed daily production reports of Patterson's bond sales, and (3) praised Patterson's unlicensed bond sales in January 2002. AR at 699. We agree with the Director that the record shows Regan both aided and abetted Patterson's unlicensed practice as a bail bond agent under any reasonable interpretation of the term.

2. Substantial evidence
¶ 48 Because the Tacoma office was extremely short-staffed, Regan allowed Patterson to continue working at Metro even after Haglund informed him that Patterson could not sell or issue bonds because she lacked a license. Patterson testified that she worked as a bail bond negotiator. Regan testified that Patterson worked as a bail bond negotiator and that she sold bail bonds throughout December 2001. Roney testified that she purchased a bail bond from Patterson. And Regan admitted that Patterson had performed the duties of a licensed bail bond agent during the transaction with Roney.
¶ 49 In addition, the daily production reports showed that Patterson worked as "day agent" and was the sole negotiator of several bonds for Metro. These reports were faxed daily to Metro's Vancouver office for Regan's review. Regan acknowledged that these reports showed Patterson's sales were low in December 2001. Moreover, Regan regularly discussed Patterson's sales with her and last did so in January 2002.
*742 ¶ 50 The record contains sufficient evidence to persuade a reasonable person that Regan aided and abetted Patterson in her unlicensed practice as a bail bond agent for Metro. Penick, 82 Wash.App. at 37, 917 P.2d 136.

IV. ARBITRARY AND CAPRICIOUS
¶ 51 Regan next argues that the Director's order modifying the ALJ's findings of fact and conclusions of law and revoking Regan's license for five years was arbitrary and capricious. We disagree.
¶ 52 Arbitrary and capricious action is "willful and unreasoning action, without consideration and in disregard of facts and circumstances. Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached." Heinmiller v. Dep't of Health, 127 Wash.2d 595, 609, 903 P.2d 433, 909 P.2d 1294 (1995), cert. denied, 518 U.S. 1006, 116 S.Ct. 2526, 135 L.Ed.2d 1051 (1996). "Action taken after giving respondent ample opportunity to be heard, exercised honestly and upon due consideration, even though it may be believed an erroneous decision has been reached, is not arbitrary or capricious." Heinmiller, 127 Wash.2d at 609, 903 P.2d 433.

A. Revision of ALJ's Order
¶ 53 As the reviewing officer, the Director has the ability and the right to modify or to replace an ALJ's findings, including findings of witness credibility. See Tapper, 122 Wash.2d at 405-06, 858 P.2d 494 (holding that RCW 34.05.464(4) vests final authority in the agency head, including the decision making power of the hearing officer, and the agency head may modify or replace an ALJ's findings). We note that RCW 34.05.464(4) required reviewing officers to give "due regard" to the presiding officer's opportunity to observe the witnesses.
¶ 54 This rule did not mean, however, that the statute required the Director to defer the ALJ's credibility determinations. Rather, the statute authorized Director to make his own independent determinations based on the record. Here, for example, in spite of the ALJ initially finding Regan credible when he testified that he had told Patterson to stay in the back room, the Director did not act arbitrarily or capriciously in reviewing and rejecting that finding of credibility and entering his own findings based on the record in light of: (1) Regan's contradictory testimony that he believed Patterson could undertake all the tasks of a bail bond negotiator except signing and posting bonds, and yet he instructed Patterson to remain in the back room and to undertake only clerical duties; (2) Regan's attempted coaching of Patterson's deposition testimony to take advantage of a perceived statutory loophole; and (3) Patterson's consistent, self-incriminating testimony contradicting Regan's testimony.

B. Severity of the Sanction
¶ 55 Regan argues that revoking Metro's and his bail bond licenses for five years was grossly disproportionate to any threat to the public and violated the Fourteenth Amendment.[15] We disagree.
¶ 56 We have previously upheld the five-year license revocation of a certified public accountant who similarly contended that an agency's sanctions were excessive, arbitrary, and capricious. Keene, 77 Wash.App. at 859-60, 894 P.2d 582. We reasoned that, even though the five-year license revocation was harsh, the agency did not take this action without due consideration because it accorded the accountant a hearing. Keene, 77 Wash.App. at 860, 894 P.2d 582.[16]
*743 ¶ 57 Similarly, the record is clear that (1) Regan received a hearing, and (2) the Director carefully reviewed the hearing testimony and the ALJ's decision before modifying the ALJ's findings and revoking Regan's and Metro's licenses for five years. Although the sanction is harsh, the Director took the action with due consideration. There is no showing that he acted arbitrarily or capriciously or that the sanction was excessive.
¶ 58 Absent compelling justification, we will not interfere with the agency's lawful exercise of its discretion. See, Shanlian v. Faulk, 68 Wash.App. 320, 328, 843 P.2d 535 (1992) (holding that the imposition of penalties is within "the allowable area of agency discretion" in which the courts may not intrude). Accordingly we affirm the DOL's final order and five-year revocation of Regan's bail bond agent license and Metro's bail bond agency license.
We concur: BRIDGEWATER, P.J., and VAN DEREN, J.
NOTES
[1] This statute was recodified in the Laws of 2004 as RCW 18.185.010(7).
[2] In describing her duties as a bail bond negotiator, Patterson testified that she "negotiated the sale of bail bonds, made phone calls regarding payment, completed paperwork, answered the phone calls, answered questions, accepted money, returned collateral." Administrative Record (AR) at 106. She testified that negotiating the sale of a bail bond meant to "work out arrangements to pay for the bonds and give collateral." AR at 106.
[3] Elizabeth Regan is David Regan's daughter; she was vice-president of Metro.
[4] DOL believed that Patterson's application misrepresented pending criminal charges against her  driving on a suspended license and possession of marijuana. Patterson believed that the charges had been resolved and that they would not affect her license application.
[5] The individual requested that his/her identity remain confidential.
[6] A signature bond requires no collateral and is secured only by a promissory note.
[7] The State filed no criminal charges against Regan or Patterson. But DOL did charge Patterson individually for the unlicensed bail-bond transaction involved in this case.
[8] Regan argues that former RCW 18.185.010(6) is vague on its face and as applied. But we will not consider facial challenges to statutes unless they involve First Amendment rights. Weden v. San Juan County, 135 Wash.2d 678, 708, 958 P.2d 273 (1998). Because this challenge does not involve First Amendment rights, we limit our review to whether former RCW 18.185.010(6) was vague as applied to Regan.
[9] The Director's findings of facts enumerated the following tasks frequently included in the sale of a bail bond:

accepting the premium payment; assisting the customer with paperwork; contacting the jail to obtain the defendant's information; explaining the process to customers; issuing a receipt to the customer; deciding whether or not to issue a signature bail bond; examining collateral for a bail bond; deciding whether to accept certain collateral for a bail bond; meeting with the defendant after his release from jail; and releasing collateral to the indemnity.
AR at 698
[10] Furthermore, we note that the Director's interpretation of "sale or issuance of bail bonds" substantially comports with Regan's own understanding of the phrase. Regan's testimony enumerates many of the same tasks, including: (1) collecting the premium, (2) assisting customers with paperwork, (3) obtaining information from the jail, (4) issuing a receipt, (5) determining the size of the bond, and (6) determining if the offered collateral meets company policies.
[11] The Director applied rules of statutory construction to conclude that the terms were used disjunctively.
[12] Importantly, the criminal statute does not require proof of intent or culpability rising to criminal accomplice liability. See former RCW 18.185.170(5). Former RCW 18.185.170(5) provided:

[T]he owner or qualified agent of a bail bond agency is guilty of a gross misdemeanor if he or she employs any person to perform the duties of a bail bond agent without the employee having in his or her possession a permanent bail bond agent license issued by the department.
[13] In assignment of error B, Regan challenges only the superior court's conclusion that the Director's findings are supported by substantial evidence. But he does not specifically assign error to any of the Director's particular findings as required by RAP 10.3(g) and (h).
[14] Finding of Fact 15 (AR at 699) states, in pertinent part:

According to Ms. Patterson's testimony, Mr. Regan did not tell Ms. Patterson to stop selling or negotiating bonds. Although Mr. Regan testified that he told Ms. Patterson in November, 2001, not to sell or negotiate bonds, Mr. Regan also testified that he knew Ms. Patterson was still selling bonds in December, 2001. Ms. Patterson testified that Mr. Regan knew she was still selling bonds in January, 2002, because he praised her sales. Ms. Patterson also testified that the daily production reports were daily faxed to Metro's Vancouver office and reviewed by David Regan. Mr. Regan did not refute that he reviewed production reports.
[15] U.S. CONST. amend. XIV, § 1.
[16] See also Division III's later opinion upholding the five-year revocation of a dentist's license, rejecting a challenge that the agency's action was excessive, arbitrary, capricious, and disproportionate to the sanctions imposed on his father and partner. Brown v. Dep't of Health, Dental Disciplinary Bd., 94 Wash.App. 7, 17, 972 P.2d 101, review denied, 138 Wash.2d 1010, 989 P.2d 1136 (1999). The court reasoned that Dr. Brown had an opportunity to present his arguments at a hearing and the agency considered the facts; thus, the sanctions could not have resulted from willful or unreasoning action. Brown, 94 Wash. App. at 17, 972 P.2d 101.