# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

THE PUYALLUP TRIBE OF INDIANS, )
a Federally Recognized Indian Tribe, )
                                )    No. 77748-3-I
            Appellant,       )
                                  )    DIVISION ONE
      v.                         )
                                  )
WASHINGTON STATE SHORELINES )
HEARINGS BOARD, CITY OF       )
TACOMA, a Washington Municipal   )
Corporation, PUGET SOUND ENERGY,)
INC., a Washington Corporation,     )
PORT OF TACOMA, a Washington   )
Special Purpose District and       )
WASHINGTON STATE            )
DEPARTMENT OF ECOLOGY,     )    UNPUBLISHED OPINION
                                  )
           Respondents.      )    FILED: <u>May 14, 2018</u>

SPEARMAN, J. — We review decisions of the Shorelines Hearings Board to determine if the Board's factual findings are supported by substantial evidence and if these findings, in turn, support the Board's conclusions of law. The Puyallup Tribe of Indians appeals the Shorelines Hearings Board's decision to affirm a shoreline substantial development permit. But because the Board's decision is supported by substantial evidence, we affirm.[1]

---

[1] Shortly before oral argument, Puget Sound Energy (PSE) filed, as supplemental authority, a decision of the Shorelines Hearing Board in a separate appeal of a Department of Ecology permit. PSE directed the court's attention to the background facts. The Tribe filed a motion to strike on the grounds that the background facts recited in the decision are not authority. We agree with the Tribe and grant the motion.

## FACTS

Puget Sound Energy (PSE) proposes to build a liquefied natural gas (LNG) facility near the Blair and Hylebos Waterways in Tacoma. The Blair and Hylebos are man-made inlets excavated from Commencement Bay. The Puyallup Tribe of Indians owns property along both waterways. The Tribe also has treaty rights to fish and shellfish in the Blair and Hylebos.

The land around the Blair and Hylebos Waterways has long been used for heavy industry. This industrial use has degraded conditions in the waterways. In 1983, the Environmental Protection Agency (EPA) listed the Blair and Hylebos Waterways as national priorities (superfund sites). The Blair Waterway was dredged to remove contaminated sediment between 1993 and 1995. Following this action, the EPA removed the Blair from the national priorities list. The Hylebos remains a national priority.

The PSE project involves a land-based LNG processing facility connected by a pipeline to a fueling station in the Blair Waterway. Originally, the project also involved a barge-loading dock on the Hylebos Waterway. As originally planned, the project entailed removing a number of old, creosote-treated piles in both waterways and replacing a dock and bulkhead on the Hylebos.

The Environmental Impact Statement

Under the State Environmental Policy Act, the project required an Environmental Impact Statement (EIS). The City of Tacoma prepared a draft EIS, notified the public, and sought comments. The Department of Ecology and the EPA both submitted comments. Ecology noted that removing existing piles will release sediment into the water. Ecology recommended that PSE consult with

the Department of Natural Resources and the EPA to determine the best approach for this work. Ecology further commented that, "[i]n general, EPA should be consulted about all in-water construction in the Hylebos Waterway problem area." Administrative Record (AR) at 1074.

In its comments, the EPA expressed concern with the proposed work on the Hylebos. EPA stated that some areas of the Hylebos had been designated "monitored natural recovery" areas. AR at 1832. These areas were expected to remain undisturbed so that clean sediment could settle over and contain contaminated sediment. The EPA stated that it had asked PSE to summarize the existing data, identify data gaps, and develop a draft sampling and analysis plan to characterize sediment quality at the Hylebos project site. The EPA recommended that the final EIS should describe the uncertainty about sediment quality in the Hylebos, state that construction sequencing and design depend upon sediment and soil quality, and, in some places, sediment and/or soil removal may need to precede construction. The EPA did not express concerns about sediment in the Blair.

The City issued a final EIS evaluating the impact of the project in several categories. The EIS concludes that, in the long term, replacing creosote-treated piles will improve water quality. While removing the piles may temporarily disturb sediment and re-suspend contaminates, this effect is short term and will last about two tide cycles. The project will also result in a long term benefit to aquatic

life by reducing the total number of piles, decreasing the total area of over water coverage, and increasing benthic habitat.[2]

The EIS recommends employing best management practices (BMPs) to avoid or minimize the impact of sediment disturbance. BMPs include using a vibratory hammer to remove piles without disturbing sediment; cutting any broken piles two feet below the mud line and filling the hole with clean fill; limiting in-water construction to a window when the fewest fish are present; installing a silt curtain around the pile removal area to prevent sediment from migrating beyond the project footprint; and containing all removed sediment and creosote-treated wood. The EIS concludes that, with these BMPs, the project is likely to improve water quality and unlikely to have an adverse effect on aquatic life.

PSE's JARPA application

In addition to the EIS, the project requires shoreline and development permits from the City of Tacoma. CP at 29-30, 34. The project also requires permits from the Washington State Department of Ecology, the Washington State Department of Fish and Wildlife, and the Army Corps of Engineers. CP at 33-34. While the EIS process was taking place, PSE submitted a master application (Joint Aquatic Resources Permit Application or JARPA) for these permits. Id. Each entity began its own review.

The Army Corps of Engineers reviewed the project for compliance with federal environmental acts. The Army Corps received input from a number of other agencies, including the EPA. The EPA did not express concerns about in-

---

[2] The benthic zone is the lowest level of a body of water. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 204 (2002).

4

water work in the Blair but commented that in-water work in the Hylebos should not occur without sediment testing. The EPA stated that the results of this testing may result in changes to the design of the project or the sequence of work. The Army Corps adopted the EPA's conditions.

The City reviewed PSE's application to determine if the project complied with Tacoma's Shorelines Master Program (TSMP). Under the TSMP, development on the shoreline must result in no net loss of ecological function. The City concluded that, if PSE adheres to BMPs and conditions imposed by other agencies, the project will meet this standard. The City issued a shoreline substantial development permit (SSDP).

The Tribe asked the City to reconsider, asserting that the City failed to adequately consider impacts to ecological function. In particular, the Tribe argued that the City had not considered the risk of spreading contaminated sediment in the Hylebos.

The City granted the Tribe's motion in part. The City stated that the SSDP erroneously omitted the standard condition that the applicant must obtain all other agency permits and comply with any conditions imposed before the City will issue development (construction or demolition) permits. The City noted that both the Department of Ecology and the EPA had identified a risk from disturbing contaminated sediment in the Hylebos and sediment testing would be required prior to federal and state permitting. The City modified the SSDP to require PSE to (1) secure all required agency permits before seeking development permits from the City; (2) demonstrate that sediment testing has been completed and

water quality regulations are met before beginning work in the Hylebos; and (3) obtain City approval of any modifications to the mitigation plan. Id. at 675.

The Tribe's appeal to the Shorelines Hearings Board

The Tribe timely appealed to the Shorelines Hearings Board, naming the City, PSE, the Port of Tacoma, and the Department of Ecology as respondents. The Tribe primarily objected that the City failed to adequately assess the impact of work on the Hylebos and improperly delegated its responsibility to other agencies. The Tribe also argued that PSE's mitigation plan was inadequate.

A few days after the Tribe filed its appeal, PSE filed a stipulation stating that it would eliminate the barge-loading dock on the Hylebos. PSE stated that it would carry out mitigation measures in the Hylebos by removing overwater decking and improving storm water drainage but perform no construction in that waterway.

The Tribe objected to the stipulation as a substantial change to the project that required a new permit application. The Tribe asserted that the purpose of the stipulation was to avoid scrutiny at the Hylebos site and PSE would likely revoke the stipulation after it served that purpose. The Tribe also argued that PSE intended to relocate the barge-loading dock to the Blair, increasing the scope of work on that waterway and requiring formal review. The Tribe asked the Board to reverse the issuance of the SSDP and remand to the City.

PSE asserted that it was bound by the stipulation, which voluntarily reduced the scope of the LNG project. PSE stated that it was eliminating the barge-loading dock, not transferring it, and the elimination of this component did not require a new permit application.

6

The Shorelines Hearings Board denied the Tribe's motion to remand but identified the Tribe's objections to the stipulation as issues on appeal. In a prehearing order, the Board also set various deadlines. The Board set April 25 as the deadline to exchange a list of exhibits.

On April 25, PSE submitted as an exhibit its revised JARPA application. Consistent with the stipulation, the revised project eliminates the barge-loading dock but retains mitigation on the Hylebos by removing overwater decking on that waterway. Construction in the Blair Waterway remains the same as originally proposed. The revised project includes additional mitigation at the Sperry Dock.

The parties presented evidence at a five-day hearing. The Tribe's experts testified that removing the existing piles will disturb potentially contaminated sediment, posing a danger to fish. The Tribe's environmental geochemist, Janet Knox, testified that contaminates had been found in many areas in Commencement Bay, including near the Blair project site. Knox opined that the City could not accurately assess environmental impact without requiring analysis of the sediment at the project site. In Knox's opinion, the identified BMPs are inadequate because they do not require monitoring. Knox opined that BMPs must be implemented in combination with other water quality criteria. Knox acknowledged that she had not visited the Blair site and her opinion as to contamination was drawn from data that was 20 to 30 years old. She stated that sediment testing is generally done under the supervision of the Army Corps or the EPA. Knox was not aware of any local jurisdiction requiring sediment testing.

Shane Cherry, a Tribe consultant, testified that he was concerned about the lack of sediment analysis. Cherry also stated that the Army Corps or the EPA

7

must approve sediment testing. Tad Deshler, a Tribe consultant, testified that PSE's proposed mitigation plan was inadequate. Deshler evaluated the mitigation measures using a habitat equivalency analysis (HEA).

Russell Ladley, a Tribe biologist, stated that removing creosote-treated piles is beneficial. He acknowledged the EPA's position that, if BMPs are employed, removing piles is unlikely to disturb subsurface contaminates. Ladley stated that he disagreed with the EPA in this matter. Ladley testified that he had never observed or supervised pile removal and his opinion was based on what he had read. Char Naylor, the Tribe's water quality manager, also stated that removing creosote-treated piles benefits water quality. He opined that BMPs are effective if followed as written but expressed concern that PSE would not adhere to the identified BMPs.

In response, PSE and the City presented their experts. PSE's expert geologist, Rick Moore, testified that there is little risk of contaminated sediment at the Blair project site. He stated that the data does not indicate a risk that would trigger sediment testing. Moore's opinion was based on data from the last ten years. Moore also testified to the effectiveness of BMPs at reducing sediment disturbance and preventing the spread of contaminates. Moore stated that the identified BMPs are approved for removing piles in locations with contaminated sediments. He stated that it was not necessary to analyze the sediment before employing these BMPs. Moore described his personal experience removing piles and stated that he had never seen the BMPs prove ineffective.

Moore also stated that the project is subject to intensive water-quality monitoring as a condition of its Army Corps permit, which includes a Water

Quality Protection and Monitoring Plan. In Moore's opinion, the project will improve water quality by removing the creosote. The project will also improve ecological function by dissipating wave energy, discouraging erosion, and stabilizing the bank.

Matthew Boyle, a biologist, testified to the effectiveness of confining work to a fish window. Boyle stated that, in Commencement Bay, the fish window is more than 90 percent effective in protecting anadromous fish.[3] Boyle also testified to the proposed mitigation plan. He stated that the HEA model used by the Tribe's expert is designed for a different purpose. Boyle disputed its applicability to shoreline mitigation. In Boyle's opinion, the revised mitigation plan accounts for different habitat values, offsets unavoidable impacts, and results in a net benefit for ecological function.

Larry Tornberg, a PSE permitting manager, stated that PSE has restricted its work to a fish window shorter than that approved by the Army Corps. Tornberg also stated that PSE is required to comply with the most current BMPs identified by the EPA and any other conditions imposed in agency permits. Tornberg testified that the earliest draft of PSE's Water Quality Protection and Monitoring Plan did not include instrumented monitoring during pile removal. He stated that the Department of Ecology raised concerns and, in response, PSE revised the plan to include monitoring during pile removal.

Shannon Brenner, the City's environmental specialist, stated that the PSE project avoids environmental impact in all but the overwater component. Brenner

---

[3] Anadromous fish are those that ascend rivers from the sea to spawn. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 58 (2002).

determined that the proposed mitigation more than offsets the impact of the overwater component so that, in its entirety, the project meets the no net loss standard. Brenner testified that the EPA is the lead agency for sediment testing in Commencement Bay and the City relies on the EPA's recommendations as to sediment quality. She stated that the City has never required sediment analysis on its own authority and could not do so without approval from the Army Corps and the Department of Ecology. Brenner also stated that the HEA model is not applicable to shoreline permitting and has never been accepted by the City.

James Thornton, an expert in sediment contamination, testified that local governments sometimes work with the EPA, Ecology, and the Army Corps to conduct sediment testing in the context of determining their own liability. He stated that a local government would have to go through Ecology or the Army Corps to use sediment samples in a regulatory setting. Thornton stated that the current consensus is that creosote piles should be removed. He testified that, when BMPs are followed, removing piles does not bring up contaminated sediment. Thornton testified that the EPA's concern with sediment contamination in the Hylebos involved the removal of an existing bulkhead. According to Thornton, the EPA recommended testing to determine whether sediment behind the bulkhead was contaminated.

The Board's order includes 52 findings of fact and 26 conclusions of law. As an initial matter, the Board determined that the Tribe had standing.[4] As to the

_____

[4] The Port challenges the Board's conclusion that the Tribe has standing to appeal the SSDP. But because the Port did not identify the issue in a notice of appeal, we do not consider it. RAP 2.4(a).

merits, the Board found that aquatic habitat in the Blair is currently degraded, removing the creosote-treated piles will benefit water quality, BMPs will minimize the impact of removing the piles, and any sediment disturbance will be short term. The Board found that the evidence did not establish the presence of sediment contamination at the project site or demonstrate that the identified BMPs are insufficient to protect water quality. The Board found that PSE's mitigation plan follows the sequence of avoidance, minimization, and compensation; the City followed its standard approach in evaluating the proposed mitigation; and the mitigation plan is adequate to achieve no net loss of ecological function.

The Board concluded as a matter of law that the City did not err in determining that the project met the no net loss standard. The Board also concluded that the City did not err in relying on agency expertise to address potential sediment contamination. The Board affirmed the SSDP.

## DISCUSSION

The Tribe challenges the Board's decision, asserting that it is unsupported by facts, was procedurally flawed, violates Tacoma's master program, and is inconsistent with Washington's Shoreline Management Act (SMA), chapter 9.58 RCW.

The SMA envisions "a planned, rational, and concerted effort, jointly performed by federal, state, and local governments, to prevent the inherent harm in an uncoordinated and piecemeal development of the state's shorelines." RCW 90.58.020. Under the SMA, local governments must create a "master program," approved by the Department of Ecology, for regulating shoreline development in

a manner consistent with the SMA. RCW 90.58.080(1), .080(3). The local government has exclusive authority to administer and enforce a permit system under its master program. RCW 90.58.140(3).

Tacoma's shoreline master program (TSMP) is codified in part as chapter 13.10 of the Tacoma Municipal Code. To issue an SSDP, the City must determine that proposed shoreline development complies with the TSMP. TMC 13.10.2.3.1.2. A purpose of the TSMP is to "[e]nsure, at minimum, no net loss of shoreline ecological functions and processes. . . ." TMC 13.10.1.2.5. Where modification to a shoreline is permitted, "all adverse impacts resulting from a development proposal or alteration shall be mitigated so as to result in no net loss of shoreline and/or critical area functions or processes." TMC 13.10.6.4.2.C.1. Mitigation requires avoiding environmental impact where practicable, minimizing unavoidable impacts, and compensating for adverse impacts. TMC 13.10.6.4.2.C.2. Adverse impacts in one location may be offset by compensatory mitigation in other areas. TMC 13.10.6.4.C.2.e.

Under the TSMP, the Blair and Hylebos Waterways are part of a designated "Port Industrial Area" zoned for continued industrial development. TMC 13.10.9.12. The Port Industrial Area is a "high-intensity environment." TMC 13.10.5.5.5, TMC 13.10.9.12. High-intensity environments provide for commercial and industrial development "while protecting existing ecological functions and restoring ecological functions in areas that have been previously degraded." TMC 13.10.5.5.5.A. In high-intensity areas, "[p]olicies and regulations shall assure no net loss of shoreline ecological functions as a result of new development." TMC 13.10.5.5.5.D.3.

12

A party aggrieved by the City's decision to grant or deny an SSDP may appeal to the Shorelines Hearings Board. RCW 90.58.180(1). The Shorelines Hearing Board is a quasi-judicial administrative body with specialized skill in hearing shoreline cases. Buechel v. Dep't of Ecology, 125 Wn.2d 196, 204, 884 P.2d 910 (1994). The Board reviews the issuance of an SSDP de novo. Id. at 202.

Our review of the Board's decision is governed by the Administrative Procedure Act (APA), chapter 34.05 RCW. RCW 90.58.180(3). Under the APA, the appellant has the burden of demonstrating that the Board's action was invalid. RCW 34.05.570(1)(a). We accord deference to the Board's "specialized knowledge and expertise." Buechel, 125 Wn.2d at 203.

Sediment testing and the no net loss standard

The Tribe contends the Board erred in concluding that PSE's project meets the no net loss standard. The Tribe challenges the Board's findings that removing the creosote-treated piles will benefit water quality, the evidence did not establish the presence of sediment contamination at the project site, BMPs will minimize sediment disturbance, the proposed mitigation is adequate, and the project will result in no net loss of ecological function. The Tribe challenges the Board's related conclusions that the project meets the TSMP's no net loss standard and the City did not err in deferring the issue of sediment testing to other agencies.

The parties agree that whether a project causes a loss of ecological function is a question of fact. We will affirm an agency's findings of fact if they are supported by substantial evidence. RCW 34.05.570(3)(e). Evidence is substantial

13

where it is sufficient to persuade a fair-minded person. de Tienne v. Shorelines Hearings Board, 197 Wn. App. 248, 276, 391 P.3d 458 (2016). We defer to the Board's decisions concerning the weight of conflicting evidence. Id. Where an agency decision is made in willful "'disregard of facts and circumstances,'" it is arbitrary and capricious and must be reversed. Id. at 277 (quoting Buechel, 125 Wn.2d at 202). A decision is not arbitrary and capricious where it reflects due consideration of conflicting opinions. Id.

The Tribe asserts that the Board lacked material information concerning sediment characterization. Without this information, the Tribe contends, the Board's decision that the project meets the no net loss standard is arbitrary and capricious. The Tribe argues that this case in analogous to de Tienne, In that case, the Shorelines Hearings Board revoked a permit because there was no scientific basis supporting the local government's decision. de Tienne, 197 Wn. App. at 288.

PSE contends the Board's decision is based on substantial scientific evidence and this case is thus unlike de Tienne. PSE asserts that, while the Tribe is focused exclusively on sediment testing, neither the Tacoma code nor the SMA require sediment testing as part of the no net loss determination. PSE argues that the Board did not act in the absence of information but based its findings on extensive evidence that the project, viewed in its entirety, will not cause a net loss of ecological function over time.

We agree with PSE. The Board heard evidence concerning the risk of disturbing contaminated sediment, indications of contamination at the project site, the effectiveness of BMPs, and the adequacy of mitigation. The Board

summarized and weighed the conflicting evidence in its decision. The Board found persuasive the respondents' evidence that there is a low risk of contamination at the project site, the identified BMPs adequately protect against that risk, any adverse impact will be short term, the proposed mitigation offsets adverse impacts, and, in the long term, the project will benefit the waterway's ecological function.

The Board's findings are supported by substantial evidence. The findings, in turn, support the conclusion that the project meets the TSMP's no net loss standard. We reject the Tribe's argument that the Board's decision has no factual or scientific basis.

The Tribe next argues that the Board erred by relieving the City of the responsibility to conduct sediment testing. In its order, the Board summarized the evidence that the City had never required sediment testing and lacked the authority to do so. The Board concluded that the City did not err in relying on the expertise of other agencies to address potential sediment contamination. The Board accorded weight to the City's longstanding interpretation of the TSMP and concluded that the City did not violate the SMA or the TSMP by deferring the issue of sediment testing to other agencies.

The Tribe argues that this was error. The Tribe asserts that the City is the only entity bound by the TSMP, the only entity responsible for making a no net

loss determination, and therefore the entity required to assess sediment quality.[5] We reject this argument.

The Board heard extensive evidence that the City does not have the authority to require sediment testing. The City's environmental specialist testified that the City has never required sediment analysis on its own authority and could not do so without approval from the EPA, the Army Corps, or the Department of Ecology. She stated that the EPA is the lead agency for sediment testing and the City relies on its recommendations. The Tribe's experts testified that sediment testing requires approval from the Army Corps or the Department of Ecology. They stated that they were not aware of any local government that required sediment testing as part of a shoreline development permit. The Board did not err in concluding that the City cannot require sediment testing on its own authority and that the City properly relies on other agencies as to sediment quality.[6]

Evidence outside the record

Next, the Tribe contends the Board erred by relying on evidence outside the record. The Tribe asserts that the Board relied on PSE's Water Quality Protection and Monitoring Plan, which was excluded from evidence. The argument is without merit.

---

[5] Notably, the Tribe does not challenge the Board's conclusions that multiple agencies have concurrent jurisdiction over shoreline resources and that the City conditions development permits on compliance with state and federal permits.

[6] The Tribe asserts that the modified SSDP, which expressly conditions the project upon PSE completing sediment analysis in the Hylebos, demonstrates that the City has authority to require sediment testing. We disagree. In comments to the Department of Ecology and the Army Corps, the EPA conditioned approval on sediment testing in the Hylebos. The City included the condition in the modified SSDP to make clear that the City's permit was conditioned on PSE's compliance with conditions imposed by other agencies.

At the hearing, the Tribe's expert, Janet Knox, testified that the BMPs are inadequate because they do not require water quality monitoring during pile removal. In response, Rick Moore testified that the project is subject to intensive monitoring as part of its Water Quality Protection and Monitoring Plan, which is required by the Army Corps. Larry Tornberg also addressed Knox's concern with monitoring. Tornberg stated that the first version of the Water Quality Protection plan did not require instrumented monitoring during pile removal. He stated that, in response to concerns raised by the Tribe and the Department of Ecology, PSE revised the plan to include intensive monitoring. Tornberg testified that Ecology raised its concerns the week before the hearing and PSE submitted its revisions the week of the hearing. PSE offered the revised plan as an exhibit. The Board declined to admit it because the Tribe had not yet seen it and PSE did not include the plan in its list of exhibits.

The Board's decision summarizes the testimony of Knox, Moore, and Tornberg concerning monitoring. Referencing Tornberg's testimony, the Board stated that "the Water Quality and Protection Plan, recently submitted to Ecology for its review and approval, provides for instrumented monitoring of pile removal." Id. at 43. The Board also stated:

> Mr. Moore also disagreed with Ms. Knox's criticisms of the Water Quality Protection and Monitoring Plan. Mr. Moore testified that he participated in the preparation of the Plan and that it requires intensive instrumented monitoring. Moore Testimony. Mr. Tornberg testified that PSE revised the Water Quality Protection and Monitoring Plan to address the Tribe's concerns and recently submitted the revised Plan to Ecology for its review and approval. The Plan will become part of the 404 Permit decision issued by the Corps for in-water construction.

Id. at 50.

17

The Board relied on testimony concerning water monitoring. The Tribe did not object to the testimony. There was no error.

Changes to the project

The Tribe next raises a number of arguments related to PSE's stipulation and revised JARPA. The Tribe contends the changes to the PSE project required a new application, the revised project was insufficient for review, and the Board should have remanded to the City.

Changes to a project after the local government has issued a shoreline development permit are governed by WAC 173-27-100. The applicant must provide the local government "detailed plans and text describing the proposed changes." WAC 173-27-100. The local government determines if formal review is necessary based on the nature of the proposed changes. Id. Substantive changes, defined as changes that "materially alter the project in a manner that relates to its conformance to the terms and conditions of the permit," require formal review. Id. Changes that are "within the scope and intent of the original permit" do not require formal review. WAC 173-27-100(1). Generally, proposed changes are within the scope and intent of the original permit if they do not increase the construction area, exceed permit requirements, or adversely impact the environment. WAC 173-27-100(2).

The Tribe argued below that PSE's stipulation eliminating work in the Hylebos and the corresponding revision to PSE's permit application were substantial changes that required a new permit application. At the hearing, the City's experts addressed this argument. Shannon Brenner, the City's environmental specialist, and Shirley Schultz, the City's principal planner,

18

testified that projects frequently change in response to concerns by various agencies. Schultz testified that she reviewed the changes to the PSE project and determined that they did not require formal review. She stated that, by eliminating work in the Hylebos and increasing mitigation, PSE reduced environmental impact and increased environmental benefit. The Board agreed with the City that the changes did not require formal review under WAC 173-27-100.

The Tribe challenges this conclusion. The Tribe asserts that WAC 173-27-100 does not apply because the revised project is not the same as the project approved in the SSDP. The Tribe provides no authority supporting this position.[7] Id. at 41 n. 19. The Board considered whether the changes to PSE's project required formal review under WAC 173-27-100 and concluded they did not. The Tribe provides no evidence to the contrary.[8] There was no error.

The Tribe next asserts that PSE's stipulation and revised application deprived the Tribe of a fair hearing. To satisfy due process, a party must receive adequate notice and an opportunity to be heard. City of Redmond v. Arroyo-Murillo, 149 Wn.2d 607, 617, 70 P.3d 847 (2003).

The Tribe asserts that it did not receive adequate notice of the changes to the PSE project and was thus denied the opportunity to prepare intelligently for the hearing. The Tribe contends the revised JARPA was filed after the discovery

---

[7] The authority the Tribe does cite, Hayes v. Yount, 87 Wn.2d 280, 291, 552 P.2d 1038 (1976), is inapposite. In Hayes, the Board determined that a project's intended use was prohibited. Hayes, 87 Wn.2d at 291. The Board rejected the applicant's "offer before the Board to accept additional conditions" and vacated the permit. Id. Hayes does not discuss WAC 173-27-100 or provide any grounds for ignoring the criteria established therein.

[8] The Tribe asserts that the City never considered the changes to PSE's project. The Tribe misconstrues the record. Brenner stated that the City had conducted "no formal review. . . ." 3VRP (5/11/16) at 132.

cutoff and the additional mitigation in the revised JARPA was merely speculative.[9]

PSE asserts that the stipulation eliminating working on the Hylebos was filed some six months before the hearing, the changes reduced the scope of work and thus were not substantive within the meaning of WAC 173-27-100, and the Tribe fully explored changes to the project during discovery. PSE contends the Tribe fails to show inadequate notice or prejudice from the changes.

We agree with PSE. PSE announced that it would eliminate work on the Hylebos in the stipulation filed six months before the hearing. As discussed above, the change reduced the scope of the project and increased environmental benefit. The Tribe asserts generally that the change was unfair but fails to point to any aspect of the revised plan that constituted an unfair surprise.

Next, the Tribe asserts that, by reviewing the revised project rather than the project originally approved by the City, the Board usurped the City's role. The Tribe relies on Overlake Fund v. Shoreline Hearings Board, 90 Wn. App. 746, 954 P.2d 304 (1998). In that case, the Board imposed a number of additional conditions to a permit granted by the City. Overlake Fund, 90 Wn. App. at 752. This court reversed, holding that substantial evidence did not support the Board's decision to redesign the project approved by the City. Id. at 751.

The case is inapposite. The Board did not, in this case, redesign the project approved by the City. PSE proposed changes to the project, the City

---

[9] The Tribe also objects to PSE's Water Quality Monitoring and Protection Plan, which was revised during the hearing. This plan, however, is a condition of the Army Corps' permit, which was not at issue in this appeal.

determined that those changes did not substantially change the project, and the Board agreed. There was no error.

Mitigation

The Tribe next objects to the Board's consideration of mitigation at the Sperry Dock as part of the no net loss analysis. At the hearing, the Tribe's expert testified that the mitigation plan did not adequately compensate for environmental impacts. His opinion was based on an HEA analysis. The City's expert testified that the HEA model is not applicable to shoreline permitting and has never been accepted by the City. She stated that PSE's original mitigation plan was adequate to meet the no net loss standard. She opined that the revised mitigation plan more than offsets the impact of the project.

In its findings, the Board summarized these conflicting opinions and stated that PSE's revised mitigation plan was adequate even under the HEA analysis. "The compensatory mitigation provided by the Revised Mitigation Plan, with the inclusion of the mitigation activities at the Sperry Ocean Terminal, exceeds the net results of Mr. Deshler's HEA analysis." CP at 58. The Board found "that the record contains substantial evidence that the Revised Mitigation Plan adequately compensates for the impacts of the Project and achieves no net loss of ecological functions." Id. at 59.

The Tribe contends the Board erred in considering the Sperry Dock mitigation. The Tribe asserts the Sperry Dock mitigation is speculative because, as of the hearing, PSE did not yet have a contract with the dock operators. Id.

The argument is without merit. Mitigation at Sperry Dock is included in PSE's revised plan. Compliance with the mitigation plan is a condition of the

SSDP. The Board did not err in considering all of the measures in PSE's revised mitigation plan.

Burden of Proof

Next, the Tribe contends the Board improperly shifted the burden of proof. In an application for a shoreline development permit, the applicant has the initial burden to prove that the proposal is consistent with the local government's criteria. RCW 90.58.140(7). The party seeking review of a local government's decision bears the burden before the Board to show that the proposal is inconsistent with the local shoreline master program or the SMA. Id. The Board reviews the matter de novo. Buechel, 125 Wn.2d at 202.

In this case, the Tribe objects to the Board's finding that "the evidence presented did not establish the presence of sediment contamination. . . or demonstrate that the measures PSE is required to implement during in-water construction will not protect water quality and anadromous fish." CP at 51. The Tribe asserts that its burden was to show that the City did not have adequate information to support its finding of no net loss, not to affirmatively prove the existence of contamination. PSE contends the Board properly reviewed the matter de novo, determined that the permit was consistent with the TSMP and the SMA, and thus found that the Tribe had not met its burden.

We agree with PSE. The Tribe's experts opined that sediment testing was necessary because contamination had been found in Commencement Bay. PSE's experts disputed the accuracy of this evidence. They also testified that, even if contaminates are present, BMPs will minimize any risk. The Board found

22

that the Tribe failed to show that sediment testing was necessary to make a no net loss determination. There was no error.

In sum, we reject all of the Tribe's challenges to the Board's decision. The Board's findings are supported by substantial evidence and the findings, in turn, support the Board's conclusions of law. The Board did not err by relying on excluded evidence, usurping the City's role, or applying an incorrect burden of proof.

Attorney fees

The Port and PSE request attorney fees on appeal pursuant to RCW 4.84.370(1). Under that statute, however, the possibility of attorney fees does not arise until two courts have affirmed the local government's decision. Habitat Watch v. Skagit County, 155 Wn.2d 397, 413, 120 P.3d 56 (2005). The statute thus provides the party challenging a land use decision "one opportunity to do so free of the risk of having to pay other parties' attorney fees and costs if they are unsuccessful before the superior court." Id. In this case, we granted PSE's petition for direct review. PSE and the Port are not entitled to attorney fees because two courts have not affirmed the land use decision.

Affirmed.

WE CONCUR:

23